777 So.2d 162 (1998)
Rayford HAGOOD
v.
STATE.
CR-95-1915.
Court of Criminal Appeals of Alabama.
August 14, 1998.
Rehearing Denied November 20, 1998.
*169 William Keith Bradford, Birmingham; and Donald L. Colee, Jr., Birmingham, for appellant.
Bill Pryor, atty. gen., and Paul H. Black-well, Jr., asst. atty. gen., for appellee.
BROWN, Judge.
The appellant, Rayford Hagood, was convicted of the capital offense of murder during a kidnapping in the first degree, a violation of § 13A-5-40(a)(1), Code of Alabama 1975. By a vote of 12-0, the jury recommended that the appellant be sentenced to death. The trial court followed the jury's recommendation and sentenced the appellant to death.
On February 14, 1994, between 7:00 a.m. and 7:30 a.m., Clarence Watkins arrived at the fork of the Sipsey River and the Mulberry River to fish. When Watkins got out of his truck and looked down the bank of the river, he saw a human body floating face-down in the water, near the bank of the Mulberry River. Watkins saw that the legs and head of the body were taped. A blanket was draped over the body. Watkins saw vehicle tracks and what appeared to be footprints and drag marks leading to the body. Watkins strung a line around the area and notified the authorities.
John Mark Tirey, who was at that time an investigator for the Walker County Sheriff's Department, arrived at the scene. Tirey retrieved the body by boat so as not to disturb the tracks, the footprints, or the drag marks. Tirey observed that the victim's ankles, knees, hands, wrists, and forearms were bound with duct tape. The victim's head was almost completely covered with the duct tape. The victim did not have a shirt on. A driver's license found in the wallet recovered from the victim identified him as Jessie Price.
Frank Cole, an investigator with the Walker County district attorney's office, interviewed the victim's wife, Mildred Patricia Price, at his office on the day the body was found. Cole took several statements from Mildred. As a result of those statements, Cole requested that Mildred telephone the appellant from his office, and she agreed to do so. Unknown to the appellant, the telephone conversation was recorded. In the telephone conversation, Mildred and the appellant agreed to adhere to their concocted story that on the night of the victim's death, she saw him leave their home with two men.
Later that afternoon, Investigator Cole and Investigator Tirey went to the mobile home where the appellant lived. The appellant agreed to accompany the investigators to the police station. The appellant initially denied involvement with the murder; however, when he was confronted with his tape-recorded conversation with Mildred Price, he confessed.
In his statement, the appellant told the investigators that he and Mildred Price had been involved in a relationship. The appellant claimed to be the father of Mildred's young son, Marlon Ray Price ("Little Ray"). The appellant said that in the months before the incident, Mildred had contacted him several times and had told him the victim was mistreating her children, including Little Ray. He stated that Jessie Price was not supporting Mildred and the children. The appellant told the investigators that what Mildred had told him bothered him a great deal.
The appellant stated that on the afternoon of the incident, Mildred telephoned him and told him Jessie had kicked Little Ray. The appellant told Mildred to leave the back door to her home unlocked and he would "put a stop to it." (R. 781.) Around 11:00 p.m., the appellant parked his car nearby and went to the Price house. He entered the house through the back door, which was unlocked. The appellant stated that he hid in the back bedroom. He said that Jessie Price got out of bed, went to the bathroom, and then returned to his bed. The appellant told the investigators that he was waiting for Price to go to sleep, and that he planned to then "bind" him and take him out of the *170 house. (R. 784.) The appellant stated that Price got out of bed and came into the room where he was hiding, and a scuffle ensued. He claimed that he managed to wrestle Price to the floor, and that someone then threw or rolled him some duct tape, which he used to bind Price's legs, feet, hands, and mouth. The appellant denied that he hit Price with anything, other than his fists. The appellant admitted that he took a pistol which, he claimed, fell from Jessie Price's pocket during the scuffle. The appellant told the investigators that the pistol could be found at his brother's mobile home, where he had been living.
According to the appellant, Mildred gave him the keys to Price's truck. He told the investigators that he put Price in the cab of the truck. The appellant claimed that Price was dressed in jeans and a shirt, and he said that he put a jacket over him. He stated that he brought a blanket from the house to put around Price so that he would not get cold. The appellant told the investigators that he drove to the fork of the Sipsey and Mulberry Rivers, and that he then took Price out of the truck and put him on the riverbank. He denied that Price fell into the river while he was with him, or that he put him in the river. The appellant maintained that when he left, Jessie Price was on the riverbank and that he was still breathing.
After leaving the area, the appellant returned to the Price house. He told Mildred where he had taken Price, and told her that Price would not bother her anymore. The investigators asked the appellant how he could have been confident of that because, according to his version of the story, the victim was alive when he left him. The appellant responded that as he was placing the tape around Price's hands, Price promised that he would leave if the appellant would not hurt him. The appellant maintained that other than binding Price, he did not hurt him. The appellant and Mildred agreed that if anyone questioned Mildred about Price's whereabouts, she would tell them that Price left with two men around midnight. After leaving the Price house, the appellant went to his brother's mobile home and watched television.
Mildred Price's 17-year-old daughter, Tammy Day, and her three younger siblings were present when the appellant attacked Jessie Price. From her bedroom, Tammy saw the appellant in the back room of the house. He had something in his hand and he did not make any noise. Tammy testified that Jessie Price got out of his bed, went into the bathroom, and then returned to bed. Price got out of bed a second time to use the bathroom. As Price was returning from the bathroom, the appellant attacked him, and started beating him. Tammy testified that Price yelled for help and begged for his life. She said that she heard a "hard hit." (R. 1127.)
Tammy testified that when the beating began, she and her three younger siblings went into their mother's bedroom. She said that she, her siblings, and her mother cried as the beating continued. She also heard Jessie Price crying. At some point, she no longer heard Price. Tammy then heard what sounded like duct tape being unrolled. She did not see the appellant carry Price to the truck. Tammy did not see the appellant again that night.
She and her siblings slept in their mother's bedroom. The next morning, Mildred told her children to remain in the bedroom until she got the kitchen cleaned.
Several witnesses testified that during the weeks preceding the incident, they had heard the appellant state that he was going to kill Jessie Price. Two witnesses testified that the appellant told them that he was going to kill Jessie Price and dump his body in the river.
Dr. Kenneth Warner performed the autopsy on Jessie Price. Dr. Warner testified that when he received the body of Jessie Price, Price was clad only in blue jeans and underwear. Price had duct tape *171 on his upper and lower legs, and his hands were taped tightly across his chest. Price also had tape around his head. Because the duct tape was so tightly wound, Dr. Warner had to remove the tape by cutting it, in order not to damage Price's skin. Although Price had some visible injuries, most of the injuries he sustained were covered by the duct tape.
Dr. Warner testified that Price had numerous bruises and lacerations on his head; one laceration was so deep that it went to the bone. The lacerations on Price's head were lineal lacerations, meaning that the lacerations were long and that the skin had been torn with something long and blunt. The lacerations were consistent with a wound caused by being stuck with an object such as a pipe. Price also had lacerations and bruises on his right arm, as well as bruises and lacerations on the back of the left hand. These injuries were consistent with defensive wounds. Dr. Warner testified that the injuries occurred before the victim's death. In his opinion, the cause of death was drowning; however, Dr. Warner indicated that Price would have died from the injuries he received, if he received no medical attention. He further testified that if Price remained conscious, the injuries would have been extremely painful.
Impressions made from the tire tracks at the scene were consistent with impressions from the tires on Price's truck. A pistol belonging to Price was found in the appellant's residence. An iron pipe found in the victim's truck had a hair fragment attached to it consistent with a hair taken from the victim. Fibers found in the bed of the victim's pickup truck were consistent with fibers from the blanket the victim was wrapped in when found. A hair that was consistent with a known hair from Mildred Price was found in the victim's hand. A cast of the footprint made at the scene bore similar characteristics to a shoe found in the mobile home where the appellant had been living.

I.
The appellant contends that the trial court erred in granting the prosecution's challenges for cause of three prospective jurors, based on their opposition to the death penalty. The appellant maintains that while each of the three prospective jurors may not have personally believed in the death penalty, "each stated that when called upon they would follow the Court's instructions, particularly as it applied to the law dealing with mitigating and aggravating circumstances." (Appellant's brief, p. 25.)
"`"There are a number of recent United States Supreme Court cases on this point which are controlling authority. The original constitutional yardstick was described in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The Court required that the juror make it unmistakably clear that he would automatically vote against capital punishment and that his feelings would prevent him from making an impartial decision as to guilt. This is no longer the test. Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), ruled that only those jurors whose [views] on capital punishment would prevent or substantially impair the performance of their duties could be challenged for cause. Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), held that the test for excluding a venireman is whether the juror's view's would prevent or substantially impair the performance of his duties in accordance with his instructions and oath. The Court expressly stated that the juror's bias did not have to be proved with unmistakable clarity. Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), stated in part as follows:
"`"`The precise wording of the question asked of [the venireman] and the answer he gave, do not by *172 themselves compel the conclusion that he could not under any circumstances recommend the death penalty. But Witt recognized that "determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." [469] U.S. at [424, 105 S.Ct. at 852]. The trial court, "aided as it undoubtedly was by its assessment of [the venireman's] demeanor," at [434, 105 S.Ct. at 857], was under the obligation to determine whether [the venireman's] views "would prevent or substantially impair the performance of his duties as a juror," id., at [433, 105 S.Ct at 857]....'"'
"`"The Eleventh Circuit Court of Appeals held in 1983 in McCorquodale v. Balkcom, 721 F.2d 1493 (11th Cir. 1983), cert. denied, 466 U.S. 954, 104 S.Ct. 2161, 80 L.Ed.2d 546 (1984), that a prospective juror who responded to the death penalty questions, `I don't think I could do it. I really don't,' has made it sufficiently clear that she could not impose the death penalty regardless of the evidence....
"`"The Fifth Circuit in Martin v. Maggio, 711 F.2d 1273 (5th Cir.1983), even held that the following equivocal responses would establish the necessary predicate for disqualification: `I don't know if I would vote for the death penalty.' and `I don't know if I could do it.' These are all euphemistic expressions of `no.'"'
"Nichols v. State, 624 So.2d 1328, 1335-36 (Ala.Cr.App.1992), quoting Watkins v. State, 509 So.2d 1071, 1073-74 (Ala. Cr.App.1986), affirmed, 509 So.2d 1074 (Ala.1987), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). See also Brownlee v. State, 545 So.2d 151, 155-56 (Ala.Cr.App.1988), affirmed, 545 So.2d 166 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989).
"`"The proper standard for determining whether a prospective juror may be excluded for cause because of his or her views on capital punishment is `whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath."' Wainwright v. Witt, 469 U.S. 412, [424], 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); Gray v. Mississippi, 481 U.S. 648, [658], 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987). `The crucial inquiry is whether the venireman could follow the court's instructions and obey his oath notwithstanding his views on capital punishment.' Dutton v. Brown, 812 F.2d 593, 595 (10th Cir.), cert. denied, Dutton v. Maynard, 484 U.S. 836, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987). A juror's bias need not be proven with `unmistakable clarity' because `juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism.' Id.

"`"A trial judge's finding on whether or not a particular juror is biased `is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province.' Witt, 469 U.S. at 429, 105 S.Ct. at 855. That finding must be accorded proper deference on appeal. Id. `A trial court's ruling on challenges for cause based on bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion.' Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, Ex parte Nobis, 401 So.2d 204 (Ala.1981)."'
"McWilliams v. State, 640 So.2d 982, 999 (Ala.Cr.App.1991), affirmed in part, remanded on other grounds, 640 So.2d 1015 (Ala.1993), quoting Martin v. State, 548 So.2d 488, 490-91 (Ala.Cr.App.1988), affirmed, 548 So.2d 496 (Ala.1989), cert. *173 denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989).
"`In determining whether a veniremember's views might prevent or "substantially impair the performance of his duties as a juror," ... a trial court is aided by being able to observe the potential juror's demeanor and tone in responding. There is no special phrase that will resolve the indecisiveness of a potential juror's responses.' Rogers v. State, 638 So.2d 1347 (Ala.Cr.App.1992), citing Watkins v. State, 509 So.2d 1071, 1073 (Ala.Cr.App.), affirmed, 509 So.2d 1074 (Ala.), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).
"`"[M]any veniremen simply cannot be asked enough questions to reach the point where their bias has been made `unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. This is why deference must be paid to the trial judge who sees and hears the juror."'
"Coral v. State, 628 So.2d 954, 970 (Ala. Cr.App.1992), after remand, 628 So.2d 988 (Ala.Cr.App.1992), affirmed, 628 So.2d 1004 (Ala.1993)[,] quoting Wainwright v. Witt, 469 U.S. at 424-26, 105 S.Ct. at 852-53 (footnote omitted)."
Jackson v. State, 674 So.2d 1318, 1340-42 (Ala.Cr.App.1993), aff'd in part, rev'd in part, 674 So.2d 1365 (Ala.1994). See also, Taylor v. State, 666 So.2d 36 (Ala.Cr.App.), opinion extended after remand, 666 So.2d 71 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).
The record reflects that during the individual voir dire, prospective juror D.S. equivocated as to whether he could recommend the death penalty. D.S.'s answers wavered depending upon how the questions were posed to him and by whom. In response to questions propounded by the prosecution, D.S. indicated that he did not think he could recommend the death penalty unless he actually saw the defendant committing the crime. When questioned by the defense, D.S. indicated he could set aside his feelings and follow the trial court's instructions. Ultimately, when pressed by the prosecution, D.S. responded that he could not recommend the death penalty unless he saw a "video" of the actual crime taking place.
Prospective juror H.E. initially indicated during individual voir dire that although he leaned towards recommending life imprisonment without parole, he would be able to follow the trial court's sentencing instructions regarding imposition of the death penalty. Later, during the individual voir dire of another prospective juror, H.E. informed the trial court that he needed to speak with the court. H.E. was subsequently brought into the courtroom, where the following occurred:
"[PROSPECTIVE JUROR H.E.]: Judge, up until yesterday I had never been confronted with the magnitude of it. And, yesterday, of course, really brought it home. When considering the reality, a very real possibility that I might have to make the decision, and after laboring with this, it would be extremely difficult for me, I think, to vote for the death penalty in a case. I don't know that I could do it.
"BY THE COURT: Are you saying that you would not under any circumstances, vote for the death penalty?
"[PROSPECTIVE JUROR H.E.]: It's hard for me to think of any circumstances where I could vote for it, you know, if I really have to make a decision. That's as close as I can come, you know. It would be very unlikely, I think, for me to vote for the death penalty. I'm sorry to complicate things. I've labored *174 with this and I felt like I needed to say it."
(R. 279-80.)
Counsel and the trial court continued to question H.E. to determine if he could set aside his personal beliefs and follow the trial court's instructions. During the questioning, H.E. suggested that he would be able to recommend the death penalty only if there were no other options. Ultimately, prospective juror H.E. stated: "If the Judge tells me I have to impose the death penalty, I will impose the death penalty. If he is not going to say that, I don't think I can impose the death penalty. That's all I know to go with." (R. 284.)
Prospective juror L.D., like prospective juror D.S., equivocated as to whether she could recommend the death penalty. Depending upon how the questions were posed and by whom, L.D. wavered between not being able to recommend the death penalty under any circumstances because of her religious convictions, to being able to set aside her personal beliefs and follow the trial court's sentencing instructions. Finally, after extensive individual voir dire, the trial court asked L.D. if she were selected to serve on the jury, whether there were any circumstances where she could recommend the death penalty. Prospective juror L.D. responded that she did not think that she could recommend the death penalty under any circumstances.
The trial court granted the prosecution's challenges for cause of these three prospective jurors. Although the defense objected to the removal of prospective jurors D.S. and H.E., there appears to have been no objection to the removal of prospective juror L.D.; nevertheless, because this case involves the death penalty, this Court must review the trial court's ruling for plain error.
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
Rule 45A, Ala.R.App.P.
"In considering what constitutes plain error in a capital case, we have adhered to the interpretation of the term `plain error' adopted by the Alabama Supreme Court, which follows the interpretation given that term by the federal courts. See Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985); Ex parte Womack, 435 So.2d 766 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983). See also Hooks v. State, 534 So.2d 329 (Ala.Cr.App. 1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989). Plain error is error that has or probably has adversely affected a substantial right of the appellant, Ala.R.App.P. 45A, or is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. Ex parte Womack. The failure to object at trial weighs against any claim of prejudice an appellant may make. Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.1991)."
Bush v. State, 695 So.2d 70, 87 (Ala.Cr. App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997). See, also, Davis v. State, 718 So.2d 1148, 1154 n. 3 (Ala.Cr. App.1997), aff'd, 718 So.2d 1166 (Ala.1998).
As noted above, "[d]espite [the] lack of clarity in the printed record ... there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." Jackson 674 So.2d at 1342, quoting Coral, 628 So.2d at 970. This is, perhaps, one such situation. While the prospective jurors' responses wavered depending upon how the *175 questions were posed to them, after continued questioning, each of the three prospective jurors ultimately indicated that he or she could not recommend the death penalty. In addition to being able to listen to the prospective jurors' responses to various questions, the trial court also had the opportunity to observe the prospective jurors' demeanor, body language, and tone of voice. Accordingly, we find no abuse of discretion in the trial court's removal for cause of the three prospective jurors.

II.
The appellant alleges that the trial court erred in denying his challenges for cause of five jurors based on their feelings regarding the imposition of the death penalty. Specifically, the appellant argues that the five jurors should have been removed because, he claims, they indicated during voir dire that they would "automatically return a sentence of death" if he were convicted of capital murder. (Appellant's brief, p. 28.) See Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), and Martin v. State, 548 So.2d 488, 491 (Ala.Cr.App.1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989) ("A veniremember who believes that the death penalty should automatically be imposed in every capital case should be excused.").
We have carefully reviewed the voir dire of the five jurors. While the jurors did indicateoften in response to suggestive or leading questionsthat they would be inclined to impose the death penalty, the record reflects that after the applicable law was explained to them, each juror indicated that he or she could follow the trial court's sentencing instructions, and that he or she would not automatically impose the death penalty.
"Such a preference [toward imposing the death penalty], where the potential [juror] indicates that he or she could nonetheless consider life imprisonment without parole is not improper and it does not indicate that the juror is biased.
"`[A] veniremember's personal feelings as to the law are immaterial unless those feelings are so unyielding as to preclude the veniremember from following the law as given in the court's instructions. "A veniremember who believes that the death penalty should automatically be imposed in every capital case should be excused." Martin v. State, 548 So.2d 488, 491 (Ala.Cr.App.1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). However, veniremembers who favor the death penalty should not be excused for cause where they indicate they can follow the court's instructions. Id.'
"Smith v. State, 698 So.2d 189 (Ala.Cr. App.1996), aff'd, 698 So.2d 219 (Ala. 1997), cert. den. 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997)."
Price v. State, 725 So.2d 1003, 1024 (Ala. Cr.App.1997).
Accordingly, we find no abuse of discretion in the trial court's refusal to grant the appellant's challenge for cause of the five jurors.

III.
During voir dire, prospective juror L.R. indicated that he was related to one of the state's witnesses, and that this relationship might cause him to give that witness's testimony more credence. The defense moved to remove prospective juror L.R. for cause. The trial court denied the motion. The appellant claims that the trial court's refusal to grant his challenge for cause constitutes reversible error.[1]
*176 Any error in the trial court's failure to grant defense counsel's challenge for cause was harmless and does not warrant reversal. Rule 45, Ala.R.App.P. The record reflects that the trial court subsequently excused prospective juror L.R., because he indicated that he would have a problem with being sequestered. Prospective juror L.R. did not serve on the jury, and the appellant did not have to use one of his peremptory strikes to remove him. See Beard v. State, 661 So.2d 789 (Ala.Cr.App. 1995). Accordingly, no reversible error occurred in denying the challenge for cause.

IV.
The appellant contends that "the trial court committed reversible error in placing an unreasonable limitation on the voir dire questions asked by defense counsel as to matter[s] of the law." (Appellant's brief, p. 33). The appellant directs this Court to several instances during voir dire examination where, he claims, the trial court abused its discretion in limiting voir dire.
The record reflects that before individual voir dire of the prospective jurors, the prosecution requested that the trial court order defense counsel not to use voir dire as an opportunity to instruct the potential jurors regarding the law, and not to ask the potential jurors how they might vote. The trial court agreed that it was the trial court's responsibility to instruct the prospective jurors regarding the applicable law.
During individual voir dire, the trial court sustained the prosecution's objections to several questions propounded by defense counsel. The appellant argues that the trial court's ruling in those instances unreasonably restricted his voir dire examination of the prospective jurors regarding matters of law. We disagree.
Rule 18.4, Ala.R.Crim.P. provides, in relevant part:
"(c) Voir Dire Examination. The court shall permit the parties or their attorneys to conduct a reasonable examination of prospective jurors....
"(d) Scope of Examination. Voir dire examination of prospective jurors shall be limited to inquiries directed to basis for challenge for cause or for obtaining information enabling the parties to knowledgeably exercise their strikes."
(Emphasis added.)
"`The scope of the voir dire examination of veniremembers is left largely to the discretion of the trial court and will not be disturbed on appeal on the ground that voir dire examination was limited absent an abuse of that discretion. Nodd v. State, 549 So.2d 139 (Ala. Cr.App.1989). The right to question veniremembers regarding their qualifications to serve on the jury or their interest or bias is limited by propriety and pertinence and is to be exercised within the sound discretion of the trial court, and the questions must be reasonable under the circumstances of the case. McLeod v. State, 581 So.2d 1144 (Ala.Cr.App.1990).
"`"The trial judge has considerable discretion in deciding what questions may be asked of the prospective jurors on voir dire. He must be free to exclude those questions which are `intended solely to accomplish such improper purpose' or which are not `phrased in neutral, non-argumentative form.' He must also be able to `restrict the examination of jurors within reasonable bounds so as to expedite *177 the trial.' And he must on occasion be allowed to restrict questioning in order to give some protection to the privacy of prospective jurors.
"`"It has been correctly noted that `appellate courts will only rarely reverse a trial judge's decision' not to permit certain questions on voir dire. Generally, courts are inclined not to reverse unless it seems likely that as a result of the limited voir dire the jury was prejudiced."
"`3 W. LaFave and J. Israel, Criminal Procedure 21.3 (1984) (citations omitted).'
"Smith v. State, 698 So.2d [189] at 198-99 [(Ala.Crim.App.1996)]. (Footnotes omitted.)"
Travis v. State, 776 So.2d 819, 832 (Ala.Cr. App.1997).
We have carefully examined the allegedly objectionable rulings in the context in which they occurred, as well as the entire voir dire examination, and we find no abuse of discretion in the trial court's rulings. The trial court cautioned counsel at the outset of individual voir dire not to venture into the specifics of the case, and not to use voir dire as an opportunity to instruct the veniremembers on the law. In each of the instances cited by the appellant, the question or the line of questioning sought improper information, and/or the question or questions were prefaced by inaccurate or incomplete statements of the law. The trial court did allow counsel to question the prospective jurors regarding their general feelings about the death penalty; however, the trial court was not inclined to allow counsel to "try the case during voir dire." Therefore, it disallowed questions that sought to elicit often very subtlyhow the prospective jurors would vote in this particular case, or questions that, essentially, "argued" the specific facts of the case. For instance, the trial court sustained the state's objections to the following questions: "[I]f you thought about kidnapping somebody but you didn't think about killing [him or her],[2] what do you think about the death penalty in those circumstances?" (R. 91); "[B]ased on what you know and what you've heard about this case and your feelings, do you feel like you would be more likely to lean toward the death penalty in this case?" (R. 116.) The other allegedly objectionable rulings by the trial court occurred in response to similar questions propounded by the defense.
"`[T]he use of hypothetical questions is of doubtful propriety certainly where one aspect of the putative evidence is singled out to probe for a sympathetic commitment as much as to explore for an impartial mind.' Ward v. State, 44 Ala.App. 229, 253, 206 So.2d 897, 921 (1966), cert. denied, 281 Ala. 650, 206 So.2d 922 (1967). `[Q]uestions that border on argument should be avoided while prospective jurors are being interrogated by the parties during the process of the selection of a jury.' Peoples v. State, 375 So.2d 561, 563 (Ala.Cr.App. 1979). On voir dire, `[a] party may not... solicit a promise to return a particular verdict.' Ford v. State, 515 So.2d 34, 45 (Ala.Cr.App.1986), affirmed, 515 So.2d 48 (Ala.1987), cert. denied, 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1023 (1988)."
Howell v. State, 618 So.2d 134, 138 (Ala.Cr. App.1992).
The trial court allowed extensive questioning of the prospective jurors. From our review of the voir dire, it is clear that both parties were allowed to elicit sufficient information to enable them to intelligently challenge for cause any objectionable prospective juror and to "knowledgeably exercise their strikes." Rule 18.4(d), Ala.R.Crim.P. Accordingly, *178 we find no abuse of discretion in the trial court's rulings.

V.
The appellant alleges that the prosecution used its peremptory strikes in a racially discriminatory manner in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); therefore, he maintains that the trial court erred in denying his Batson motion.
The record reflects that after the selection of the jury, the following transpired:
"BY MR. GUSTIN [defense counsel]: We object. There were only two black venire people on the jury and the State struck both of them.
"BY MR. TATUM [defense counsel]: Your Honor, there is no proper reason for striking, first of all, a black female, T.P. The only thing she stated in the course of voir dire was that she knew me and knew someone in my family. When asked the question, `Would that in any way affect your ability to sit and be unbiased in this case?' she stated, `No, I could be fair and unbiased.' Most of the people on the venire said, `I know someone' and everybody on the venire said, `It would not affect me.' So, if that is a proper reason for striking Ms. P., then it is highly suspect under the circumstances.
"The caselaw says where there are only two or three or a certain number of blacks on the venire and the D.A. used his strikes to get rid of both of them, then that is strong evidence of a prima facie case, under Batson.

"We submit that is the same situation for Mr. V.M. .... again, he stated that he knew me but he was not my friend, we didn't do anything together. Could he put aside the fact he knew me or went to school with me, `Yes, I can.'
"I point out, again, that several white men knew several people in the court-room, Mr. Baker [the district attorney] included and all of them testified, `We will set that aside and be fair and impartial.'
"So, there has to be another reason for striking. We submit there is a prima facie showing it is because of race and the D.A. should have the burden to come forth and show why they struck the only two black members of the venire.
"BY MR. BAKER: [district attorney]: He hasn't made a prima facie case.
"BY THE COURT: Just for argument, let me say he has.
". . . .
"BY MR. ADAIR: [assistant district attorney] I've tried cases recently before the Court and we have been instructed that unless there is specific findings of a prima facie case, we don't need to put reasons on the record unless there is that.
"BY THE COURT: I don't find a prima facie case.
". . . .
"BY MR. BAKER: If I might respond?
"BY THE COURT: Go ahead.
"BY MR. BAKER: First of all, there would be two blacks on this jury, as there are on most of my juries, I might add, historically speaking and I'm prepared to get under oath and answer that.
"Ms. A.J.P., we all knew that the Defense wanted off, was excused because her daughter had surgery. She would have certainly been on here.
"BY MR. TATUM: I object to that.
"BY THE COURT: That's not part of Batson.

"BY MR. BAKER: And, second, we argued to keep [prospective juror T.G.] on and they fought and made a motion. They made a motion and in effect had him struck. They struck a black for cause. I fought with everything in me to keep T.G. on this panel, but they wouldn't have him on this panel.

*179 "BY THE COURT: Why did you strike the two who were left on?
"BY MR. BAKER: Okay. I asked a question and that question was, `Has anybody ever seen or done business, or been a client of Mr. Tatum, or a friend?' I asked the same thing of Mr. Gustin. Nobody answered on Mr. Gustin, and on Mr. Tatum, Mr. M. said he was his friend and he answered that initially and then went into detail about knowing his brother and then, of course, his position on the death penalty, too.
"Ms. P. had been to his office once on legal matters and had been there on other occasions on social matters.
"The State obviously applied the same standard to Mr. Gustin because nobody on the panel stated they were a friend of Mr. Gustin or had sought legal advice from him. But, two did on Mr. Tatum and those two were struckhis friends and those who had sought legal advice from him.
"In addition the fact that they were both very weak on the death penalty, especially Mr. M., who I think we may have asked to be struck for cause because of his statements about it.[[3]]
"BY THE COURT: Anything else?
"BY MR. TATUM: We would like to call the Court's attention to Alabama Rules of Criminal Procedure, Hugh Maddox (2d ed.), under section 18. It specifically points out, striking all or most blacks from jury is evidence that the state used its peremptory challenges to dismiss all or most of black jurors from the venire is strong evidence of a prima facie case.
"We submit the Court has erroneously concluded that we have not proved a prima facie case and the fact that blacks were dismissed for cause at Defendant's request has nothing to do with proving validity of the State's
"BY THE COURT: I say you have a prima facie case. I'm satisfied with the State's explanation."
(R. 423-28.)
As reflected in the above excerpt from the record, the prosecution gave its explanation for its peremptory strikes before the trial court determined that the defense had presented a prima facie case of racial discrimination; however, this does not preclude review of the prosecution's explanations or the trial court's ruling. In addressing a Batson claim, we have stated:
"`"[W]hen the trial court calls upon the prosecutor for an explanation, without expressly finding a prima facie case, we will proceed directly to evaluate the sufficiency of the ensuing explanation." Williams v. State, 548 So.2d 501, 504 (Ala.Cr.App.1988), cert. denied, 489 U.S. 1028, 109 S.Ct. 1159, 103 L.Ed.2d 218 (1989). If any of the explanations advanced by a prosecutor are deemed to be insufficient, the defendant's conviction will be reversed, even if the defendant did not establish a prima facie case. See Jackson v. State, 594 So.2d [1289] at 1292-94 [(Ala.Crim.App.1991)].'
"Taylor v. State, 666 So.2d 36, 40 (Ala. Crim.App.1994).
"`"The trial court evaluates an objection to the use of peremptory challenges under the three-step analysis set forth in Batson. First, as we have said, a defendant must make a prima facie showing that the state has exercised a peremptory challenge or challenges on the basis of race or gender. Second, once a prima facie showing has been made, the burden shifts to the state to articulate a race- or gender-neutral explanation for striking the prospective jurors in question that is related to the case to be tried. Batson, 476 U.S. at 98, 106 S.Ct. at *180 1723-24. The United States Supreme Court recently stated in Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), that the second step does not demand an explanation that is persuasive or even plausible. It stated that a legitimate explanation is not necessarily one that must make sense, but one that does not deny equal protection. At this step of the inquiry, the issue is facial validity of the prosecutor's explanation, and unless a discriminatory intent is inherent in the explanation, the reason offered will be deemed neutral. Id., at 768, 115 S.Ct. at 1771. When the defendant challenges as pretextual the prosecutor's explanations as to a particular venireperson, the inquiry becomes factual in nature and moves to step three. At this step the trial court must resolve the factual dispute, and whether the prosecutor intended to discriminate is a question of fact. Hernandez v. New York, 500 U.S. 352, 364-65, 111 S.Ct. 1859, 1868-69, 114 L.Ed.2d 395 (1991). In the third step, the trial court must determine whether the defendant has met his burden of proving purposeful discrimination. At this stage, the trial court must consider the persuasiveness of the explanations, and it is also at this stage that `implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.' Purkett, 514 U.S. at 768, 115 S.Ct. at 1771."
"`Bush v. State, 695 So.2d 70, 96 (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.1997).
"`A circuit court's ruling on a Batson objection is entitled to great deference, and we will reverse such a ruling only if it is clearly erroneous. Ex parte Branch, 526 So.2d 609 (Ala.1987); Ex parte Thomas, 659 So.2d 3 (Ala.1994); Lynn v. State, 543 So.2d 709 (Ala.1988), cert. denied, 493 U.S. 945, 110 S.Ct. 351, 107 L.Ed.2d 338 (1989).'
"Talley v. State, 687 So.2d 1261, 1267 (Ala.Crim.App.1996).
"`"[A] finding is `clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."'
"Davis v. State, 555 So.2d 309, 312 (Ala. Crim.App.1989), quoting Powell v. State, 548 So.2d 590 (Ala.Cr.App.1988)."
Fletcher v. State, 703 So.2d 432, 435-36 (Ala.Cr.App.1997).
Applying the above analysis to the present case, we hold that the prosecution's explanation for its peremptory strikes was facially valid and race-neutral. The prosecution purportedly struck the two prospective jurors, T.P. and V.M., because they knew one of the defense lawyers, and because of the prospective jurors' opposition to the death penalty. These reasons have been held to be raceneutral. See Roberts v. State, 627 So.2d 1114, 1115 (Ala.Cr.App.1993); Travis v. State, 776 So.2d 819 (Ala.Cr.App.1997). It does not matter that the trial court denied the prosecution's challenge for cause of prospective juror T.P., because the prosecution's explanation for the strike "`"need not rise to the level of a challenge for cause." Ex parte Branch, 526 So.2d [609] at 623 [(Ala.1987)].' Ford v. State, 628 So.2d 1068, 1070 (Ala.Cr.App.1993)." Wood v. State, 715 So.2d 812, 817 (Ala.Cr. App.1996), aff'd, 715 So.2d 819 (Ala.1998).
Moreover, contrary to the intimation by defense counsel at trial, the prosecution did not show disparate treatment by failing to strike white persons who also knew defense counsel. The record reflects that when the prosecution asked all of the prospective jurors if any of them knew defense counsel Tatum, seven people responded, including prospective jurors T.P. *181 and V.M. Five prospective jurors indicated that they knew defense counsel Gustin. At the conclusion of voir dire, of the persons who indicated that they knew one or both of the defense attorneys, only prospective jurors T.P., V.M., and C.E.[4] remained all of the others had either been removed for cause or excused by the trial court.
When the prosecution offered its explanations for the strikes, the defense offered no evidence to demonstrate that the prosecution's explanations were pretextual; rather, counsel simply reasserted its position that the state's use of its peremptory strikes to remove the remaining black veniremembers constituted a prima facie case of racial discrimination.
Accordingly, after applying the above law to the instant facts, we cannot say the trial court's ruling on the Batson motion was clearly erroneous.

VI.
The "[a]ppellant contends the trial court erred in denying two of his requests for a mistrial based upon the State's violation of discovery orders entered in this case." (Appellant's brief, p. 37) The appellant appears to suggest that the prosecution violated the trial court's discovery order because, he intimates, the prosecution failed to timely provide the defense with copies of the notes Investigator Frank Cole made during the course of his investigation. In order to properly address the appellant's allegation, an understanding of the context in which the alleged discovery violation came to light is essential.
The record reflects that at trial, during the prosecution's examination of Sheriff John Mark Tirey, a hearing was conducted outside the presence of the jury on the appellant's motion to suppress his confession. Tirey testified at the suppression hearing, in relevant part, that after learning of the appellant's possible involvement in the crime, he and Investigator Frank Cole went to the mobile home where the appellant had been living. He thought that they arrived at the residence shortly before 2:00 p.m. The appellant agreed to accompany the investigators to the police station for questioning. They did not discuss the crime on the way to the station. Tirey testified that the appellant was apprised of his rights en route to the station, and that they arrived at the station between 2:07 and 2:17 p.m.
The appellant subsequently confessed his involvement in the crime to Tirey and Frank Cole, and his confession was recorded on audiotape. Tirey indicated that they did not make any notes of the conversation that was conducted with the appellant before he gave his recorded confession.
Investigator Frank Cole testified that he and Tirey arrived at the appellant's residence between 1:45 and 2:00 p.m. In response to questioning, Cole testified that he made a "note" that he read the appellant his rights at 2:07 p.m. Cole testified that they discussed only very general matters on the way to the police station, and that they did not discuss the crime. In response to a question as to whether he made notes of his conversation with the appellant, Cole responded that he "jotted down that I had read him his rights." (R. 701.) Cole testified that that was the substance of all the notes he had taken. Cole testified that when they arrived at the station, he and Tirey had a conversation with the appellant.
The following then occurred:
"Q [Defense counsel]: Okay. And, what was the first thing you said to Rayford, that you recall and the first thing he said to you?
"A: Asked him if he knew Jessie Price. He said he did.
"Q: Did you have the tape recorder on then?

*182 "A: No, I didn't.
"Q: Were you making some notes?

"A: Not at that time, I didn't make no notes, no.

"Q: Have you ever made any notes of that conversation before the tape recorder was turned on?

"A: No, I had not, not to my knowledge. I don't remember making no notes."
(R. 702; emphasis added.)
Later in the suppression hearing, the following transpired:
"Q [Defense counsel]: At any time did you ask Rayford could you search anything?
"A: [Investigator Cole]: Yes.
"Q: And, when was that?
"A: At the Sumiton Police Department.
"Q: Was this before the tape recorder was turned on?
"A: It may have been after we finished it. I can't remember.
"Q: Do you have anything that he signed?
"A: Yes, sir. I believe Sheriff John Mark Tirey is the one who brought that out.
"Q: Frank, is there a time on anything, this item that you say Rayford Hagood signed?
"A: I don't see one.
"Q: Frank, you made extensive notes during this investigation, did you not?

"A: Notes?

"Q: Yes, personal notes, investigative notes?

"A: Whatever I made, you have a copy of.

"BY MR. GUSTIN [defense counsel]: Judge, at this time, there was a lot of Frank Cole's investigative notes that was not turned over for discovery when Bill [assistant district attorney] and I met. I think Bill and I agreed to disagree and to request the Court for an in camera inspection of these notes to determine if they should be turned over to us. We would request, at this time, prior to any further examination of Mr. Cole, that the notes be turned over to the Court to determine if we should inspect them. They could be very relevant as to the times and consent to search and things like that.

"BY MR. BAKER [district attorney]: Bill told me he turned those over to you.
"BY MR. ADAIR [assistant district attorney]: Judge, you had those in your possession.
"BY THE COURT: They are in my office.
"BY MR. ADAIR: I think everything they had was given a number and put on inventory sheet and you either signed for it or the Judge signed for it.
"BY MR. GUSTIN: Okay. I just want to make sure that all the field notes were turned over to the Court.
"BY THE COURT: I'm looking to see if there is any Brady material in there?
"BY MR. GUSTIN: Yes, sir, but I would like to see if there is any times in there as to arrival at the residences and such like that. Any Brady material, any discoverable material. And, we would like to mark those as an exhibit and let the Court review them and place them into evidence."
"BY THE COURT: Go ahead with anything else that you've got.
"BY MR. GUSTIN: Judge, at this time until we review any notes or anything, the Court has time to review them, we are at a stopping point.
"BY THE COURT: Well, as to the admissibility of the [presumably, the confession]
"BY MR. GUSTIN: We still have some evidence to put on regarding that.
"BY THE COURT: Well, why don't you put your evidence on?

*183 "BY MR. GUSTIN: Judge, I would like to do that for time's sake, but I really need to further examine Frank if there is any notes on this before we put anything else on.
"BY THE COURT: I'm looking for times.
"BY MR. GUSTIN: And, Brady material.
"BY THE COURT: Not Brady material right now, just times. You're looking for times within the framework of Mr. Hagood's interrogation. You contend it's an arrest?
"BY MR. GUSTIN: We contend that it's an arrest.
"BY THE COURT: Yes. There is a time in here but you already have this time 2:07 P.M., 2-14-94. There are no times other than 2:07.
"BY MR. GUSTIN: Then we ask the Court to go into any notes as to any conversations that were not on tape.
"BY THE COURT: There are none, as far as times.
"BY MR. GUSTIN: Are there any notes of any conversation with the Defendant concerning what we've been
"BY THE COURT: The only times contained in any of these are, `Interview started at 2:07.' Of course, there are times that they got there at 7:40 at the scene. Times around the time of talking to Mr. Hagood, 2:07 is the only one contained in here.
"BY MR. GUSTIN: Outside of time, any notes as to any conversations an officer may have had with Mr. Hagood.
"BY THE COURT: This one, they had
"BY MR. GUSTIN: I would like to look at it.
"BY THE COURT: You've got it. The statement.
"BY MR. GUSTIN: Nothing in the notes that contain any conversation. I think we would be entitled to that.
"BY THE COURT: This is certainly not Brady material. Could be impeachment material but not of this witness. Nothing that is going to shake the foundation of the world.
"BY MR. GUSTIN: Judge, we would move for disclosure of all the notes, under the Brady rule.
". . . .
"BY THE COURT: No. Denied.
"BY MR. GUSTIN: We move for disclosure of all notes under
"BY THE COURT: That rule goes to he uses his notes to refresh his recollection to testify from.
"BY MR. GUSTIN; Judge, I'm going under another rule, under extended discovery in capital cases and that would be Supreme Court decision in Ex parte Monk, [557 So.2d 832 (Ala.1989)].
"BY THE COURT: Read it.
"BY MR. GUSTIN: Capital cases are substantially different from other cases because there is no other criminal case other than a crime of murder, where possible punishment is death or life imprisonment without parole. The death penalty is special circumstances justifying broader discovery in capital cases. It is very important that discovery in capital cases by governed by broader requirements.
"BY MR. BAKER: We've been about as broad as the road is. We've given you a copy of every witness's statement, to my knowledge, that we have. We've made them a list of every piece of evidence. They know about it. Outside what we consider a work product that has been turned over to the Court, they've got it. They've had an opportunity to view all physical evidence.
"BY MR. GUSTIN: Not only just apply to Brady material but also applies to any material that could arguably be favorable to the defense.
"BY THE COURT: Well, we're on discovery. You need this for the statement. I can go over this more meticulously *184 but I would like to get the statement in. Are you finished with the statement?.
"BY MR. GUSTIN: Okay. We would like to keep it out.
"BY THE COURT: I know that. But, are you finished with the argument on the statement?
"BY MR. GUSTIN: One question of Mr. Cole.
"BY THE COURT: Okay.
"Q: Mr. Cole, the Court has gone through some typed notes. Did you make those typed notes?
"A: I have no idea. I haven't looked at them.
"BY MR. GUSTIN: Can we ask Mr. Cole to look at them and see if he made those typed notes? The ones we proffered to the Court.
"BY THE COURT: Did you type those notes?
"BY MR. COLE: I didn't type them. I may have dictated them, Judge. Yes. sir.
"Q: Mr. Cole, I understand that you probably didn't type them yourself.
"A: Correct.
"Q: Did you review them after they were typed?
"A: I probably briefed them, yes.
"Q: Now, when you either dictated these or gave them to someone to type, did you have any material that you referred to, such as handwritten notes, that you used to comprise this typewritten note?
"A: I don't believe I did.
"Q: Have all handwritten notes been turned over to the District Attorney's office?
"A: Everything in my file, yes, sir.
"BY MR. GUSTIN: Have all the handwritten notes been turned over to the Court?
"BY MR. ADAIR: Everything was given a number.
"BY MR. GUSTIN: We ask the Court that if there is any handwritten notesAll handwritten notes that the D.A. be ordered to turn them over to the Court. We ask that all handwritten notes be turned over to the Court.
"BY MR. ADAIR: Everything that we have or everything I was given, was given a number and given to the Court or you.
"BY MR. GUSTIN: We would ask that if there is any handwritten notes in the possession of any law enforcement officer involving this case that have not been turned over to the Court, that they be ordered to be turned over to the District Attorney and then the Court.
"BY THE COURT: No, denied.
"BY MR. GUSTIN: Okay."
"Q: Mr. Cole, let me show you what has been marked as [defendant's] Exhibit # 2 for the suppression hearing. Do you recognize that?

"A: Yes, I recognize that.
"Q: What do you recognize it as?
"A: Notes I had typed.
"Q: Had typed or you typed them?
"A: I had them typed.
"Q: Okay. Now when were these notes made?
"A: I don't know. I don't know if there is not a date on the copy. I don't know when I made the notes.
"Q: Were they made close to or at the time of the incident that you are referring to in these notes?
"A: Probably a day or so later.
"Q: Okay. And, that's when your mind would be fresher?
"A: If it was a day or so later, I guess, Pat.
". . . .
"Q: Would you read that note [defendant's exhibit # 2] to the Court?
"A: `Myself, John Tirey, J.C. Poe, [and] Danny Robinson travelled to Sumiton, Alabama, to the residence of Rayford Hagood located at Lot 5, Pondorosa *185 Trailer Park, Sumiton, Alabama. We located Rayford Hagood at his residence and asked him if he would mind travelling with myself and John Tirey to the Sumiton Police Department. He advised that he would go with us. We arrived at the Sumiton Police Department where Mr. Hagood was advised of his rights by Investigator Tirey. Mr. Hagood advised that he understood his rights and would talk to us. We asked Mr. Hagood for consent to search his...'
"Q: But, the only reference to rights being read in that note that you made several days after this occurred, was rights being read at the police station; is that correct?
"A: That's correct.
"Q: There is no reference in those notes that you made shortly after this incident occurred, as to any rights being read at the trailer?
"A: Nobody has notes that were made that day.

"Q: But, no reference made in these notes?
"A: No.
"Q: Okay. Do you have notes that were made that day that have not been turned over to us?

"A: I just showed them to you a few minutes ago.

"Q: May I see them?

"A: Sure. There are dated 2-14-94.

"BY MR. GUSTIN: Okay. Thank you, Mr. Cole.
"BY MR. BAKER [district attorney]
"Q: So, Frank what you're telling us is that in addition to making notes as you went along, like on that, you dictated some notes, too?

"A: Yes, I did.

"Q: So, when Mr. Gustin was asking you about that not being in there, there was another document made that day, handwritten, that was in there.

"A: That day or before that day.

"BY MR. BAKER: Would you mark this as Suppression Hearing, State's Exhibit, please.

"(Whereupon, document marked as State's Exhibit # 25 for Suppression Hearing.)
"Q: This Exhibit # 25, is that your notes and your handwriting?

"A: That's my notes and my handwriting.

"Q: Is there anything in these notes that says what time you read his rights to him?

"A: There is.
"Q: What is that?
"A: Read his rights at 2:07 p.m. on 2-14-94.

"Q: On 2-14-94. That's what you testified to earlier?

"A: Yes, sir.
"BY MR. BAKER: We move to admit State's exhibit # 25, for Suppression Hearing, only."
(R. 711-25; emphasis added.)
The suppression hearing continued, and the appellant testified to his version of the events surrounding his confession. The trial court denied the appellant's motion to suppress his confession.
As noted above, the appellant argues that the "trial court erred in denying two of his requests for mistrial based upon the State's violation of discovery orders entered in this case," namely, the state's failure to furnish the defense copies of Investigator Frank Cole's notes before the suppression hearing. Contrary to the appellant's assertion in his brief, the record does not contain any motion for a mistrial based on the state's alleged failure to comply with the trial court's discovery order. Moreover, as evidenced from the above excerpt, it does not appear that the appellant objected on the grounds that the prosecution failed to timely furnish the "notes" to defense counsel. The confusion is exacerbated by the fact that the appellant does not specify to this Court which "notes" the *186 state allegedly failed to furnish him before the suppression hearing, and it is certainly not evident from the above-quoted excerpt from the record. Nevertheless, as best we can discern, the gist of the appellant's argument appears to be that his conviction must be reversed because the state allegedly failed to furnish to the defense, before the suppression hearing, a copy of the handwritten note made by Frank Cole on February 14, 1994, which was labeled State's exhibit 25 for the suppression hearing.
Assuming, for the sake of argument, that the appellant was entitled to discovery of the investigator's note before trial, no reversal is warranted due to the state's alleged late disclosure of the note, because the appellant has not demonstrated how he was prejudiced by the late disclosure. "Prejudice caused by the late disclosure is a `prerequisite for a reversal on this issue.'" Taylor v. State, 666 So.2d 36, 54 (Ala.Cr.App.1994), quoting Pettway v. State, 607 So.2d 325, 332 (Ala.Cr.App. 1992).
Although it is not clear, there is some indication that there may have been other "field notes"in addition to defendant's exhibit 2 and State's exhibit 25 that were prepared by Investigator Cole and submitted to the trial court for an in camera inspection, but that were not furnished to the defense. For example, at the conclusion of Investigator Cole's testimony at the suppression hearing, the trial court stated: "I have one other excerpt from what is called `information sheet, February 25, 1994, death of Jessie Price,' by Frank Cole. There is a discrepancy in time by 10 minutes.... Rights were read at 2:07, statement 2:17." (R. 727.) In addition, later in the trial, defense counsel requested a ruling on the "officer's notes that were turned over to the court by Mr. Adair." (R. 1002.) The trial court responded, "There is nothing in there. Other than time frame." (R. 1002.)
As best we can discern, the appellant does not appear to be arguing that he was entitled to those notes. Even if he were, no reversible error occurred by the trial court's failure to order production of those notes. The trial court determined that the notes were not discoverable because they constituted "work product." The trial court found that there was "no Brady material" in the notes and that the notes contained just "a list of witnesses and ... [j]ust a general chronology of what ... occurred." (R. 1002-03.) The trial court indicated that it would reconsider its ruling on the notes if defense counsel could provide the court with persuasive caselaw. There is no indication that the defense provided the court with any grounds for reconsidering its ruling.
Generally, investigative reports prepared by law enforcement agents in connection with the investigation of a case are not discoverable. See Rule 16.1(e), Ala. R.Crim.P. However, the rule is different if the law enforcement agent testifies in the trial of the case.
"In Pate v. State, 415 So.2d 1131, 1139 (Ala.Cr.App.1980), this court held that the defendant was not entitled to inspect statements that `were not used by the victims to refresh their recollections while they were on the witness stand.' The Supreme Court reversed this decision, stating:
"`The rule of discovery is different where a prosecution witness has testified on direct examination in the trial of the case.
"`In such cases, the defendant, upon laying a proper predicate, is entitled to have the Court, at least, conduct an in camera inspection as outlined in Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959). The trial court could determine initially (1) whether the statement made by the witness before trial differed in any respects from statements made to the jury during trial, and (2) whether the statement requested *187 was of such a nature that without it the defendant's trial would be fundamentally unfair. Cooks [v. State, 50 Ala.App. 49, 276 So.2d 634, cert. denied, 290 Ala. 363, 276 So.2d 640 (1973)].'
"Ex parte Pate, 415 So.2d at 1144.
"The sole issue in Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287, (1959), cited in Ex parte Pate, concerned an analysis of the Jencks Act [18 U.S.C. § 3500]. With Ex parte Pate, the Alabama Supreme Court, in essence, adopted the in camera inspection process of subsection (c) of the Jencks Act. See also Cooks v. State, 50 Ala.App. 49, 276 So.2d 634, cert. denied, 290 Ala. 363, 276 So.2d 640 (1973). It also appears that our Supreme Court has implicitly rejected the notion that the witness must actually refer to the statement while testifying on direct examination before the defendant is entitled to the minimum in camera inspection.
"Ex parte Pate involved pre-trial statements made by prosecution witnesses. However, this court applied the same principle to police reports in Bogan v. State, 529 So.2d 1029, 1031 (Ala. Cr.App.1988). We note that the federal courts have made it clear that reports of law enforcement officers are subject to the provisions of the Jencks Act. Lewis v. United States, 340 F.2d 678, 682 (8th Cir.1965), and cases cited therein."
Johnson v. State, 555 So.2d 818, 822 (Ala. Cr.App.1989), on return to remand, 576 So.2d 1279 (Ala.Cr.App.1990), rev'd on a preservation issue, 576 So.2d 1281 (Ala. 1991).
In this case, the trial court did conduct an in camera review of the notes and apparently determined that the notes contained nothing inconsistent with Investigator Cole's testimony. Although this ruling was made before Investigator Cole testified before the jury during the trial, Investigator Cole's trial testimony did not differ substantially from his testimony at the suppression hearing. Moreover, following the direct examination of Cole at trial, the appellant did not request that the trial court re-examine the notes and its previous ruling in order to determine if the notes contained any information that conflicted with Cole's trial testimony on direct examination. Therefore, we find that the trial court "in effect and substance, followed the procedure set out in Pate." Bogan v. State, 529 So.2d 1029, 1031 (Ala.Cr. App.1988).

VII.
The appellant claims that the trial court erred in overruling his objection to a hypothetical question the prosecution posed to a defense witness during cross-examination because, he claims, the question was based on facts not in evidence. We disagree.
The defense presented the testimony of Wayne Burrow, a trace evidence technician employed by the Alabama Department of Forensic Sciences. He testified that he had compared various soil samples taken from the riverbank where the victim's body was found to soil recovered from the driver's side floorboard of the victim's truck and to soil found on a pair of shoes recovered from the mobile home where the appellant had been living. Burrow testified that, in his opinion, the soil found on the shoes and the floorboard of the truck was from a different origin than the soil from the riverbank.
During cross-examination, the prosecution asked Burrow whether the soil on shoes could have been "mixed" with other types of soil if the shoes were worn in different soil conditions. During this line of questioning, the following occurred:
"Q: So, if a fellow was down at the riverbank, if he had some business at the river, let's assume hypothetically, that a man is down at the riverbank, such as this here at the Mulberry Fork and the Sipsey Fork in Walker County, Alabama, to-wit: on or about 12:00 February *188 14, 1994, and he goes down close to the river's edge and gets his feet muddy performing some type activity and gets them wet there, close to the water and gets them moist, like you are talking about, you would expect when he came in contact with other soil, if his shoes were damp, that there would be these mixing of the colors and mixing of the soil?
"BY MR. TATUM: I object. Improper hypothetical.
"BY THE COURT: Overruled.
"A: I would expect it to adhere to it, yes."
(R. 1225.)
As noted above, the appellant contends that the trial court erred in overruling his objection because, he argues, the question was based on facts not in evidence. Specifically, the appellant states that the "hypothetical stated ... many facts which were not in evidence including, activity around, tracking back and forth over various dirt items." (Appellant's brief, p. 40.)
"The law is well established that a hypothetical question asked of an expert must be based upon facts that are in evidence. Perkins v. State, 580 So.2d 4 (Ala.Crim.App.1990); Winton v. State, 563 So.2d 22 (Ala.Crim.App.1990). The facts upon which the opinion is based may also be reasonably inferred from the facts which are already in evidence. Winton 563 So.2d at 25."
Smitherman v. State, 627 So.2d 1116, 1119 (Ala.Cr.App.1993).[5]
At the time of the allegedly improper question, the prosecution had already elicited from Burrow that soil on shoes could be "mixed" if those shoes are worn in various soil conditions. The state had also presented evidence that after beating and binding the victim with tape, the appellant drove to the river, where he placed the victim in the river. The appellant left a deep footprint impression in the mud by the river. Afterwards, the appellant left the river, and returned to Price's house to speak with Price's wife. From there, he went to the mobile home where he had been living. Thus, there was evidence presented from which it could be inferred that the appellant got mud on his shoes at the riverbank, and that he then wore the muddy shoes in other locations, thereby mixing the mud on his shoes with other types of soil.
Because all of the facts in the hypothetical were already in evidence, the trial court did not err in overruling the appellant's objection.

VIII.
The appellant claims that the trial court improperly precluded him from impeaching the testimony of two prosecution witnesses. We disagree.
Cindy Stewart, Mildred Price's daughter, testified that a few days before the victim was killed, the appellant told her that he was going to follow the victim to church and shoot him.
William Day, Mildred Price's son, also testified regarding a conversation that he had with the appellant before the victim's death. He testified that "[the appellant] was just ratting off about he was going to kill him and throw him in the river below the trailer." (R. 1009.)
*189 The defense called Roger Sandlin, a private investigator hired by the defense, and attempted to elicit testimony that Sandlin had spoken with Cindy Stewart and William Day, and that neither witness had mentioned that the appellant had threatened to kill the victim. The prosecution objected on several grounds, including that the defense had failed to establish the proper predicate for the testimony. The trial court sustained the state's objection. We find no error in the trial court's ruling.
"Before a witness may be impeached by use of a prior inconsistent statement, the party seeking to impeach must lay a proper predicate.
"`When a witness, on cross-examination, denies that he made a statement out of court which is inconsistent with his testimony on direct examination, the only available move for the impeaching party is to bring on an impeaching witness who can testify as to the prior inconsistent statement of the witness being impeached. Before such extrinsic evidence may be elicited, however, it is the general rule that the impeaching party must lay a proper predicate by asking the party being impeached whether he made such statement, specifying with reasonable certainty the time when, the place where, the person to whom such supposed statement was made and the substance of such statement.'
"C. Gamble, McElroy's Alabama Evidence, § 157.01(1) (4th ed.1991).
"The new Alabama Rules of Evidence, effective January 1, 1996, state:
"`Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness has been confronted with the circumstances of the statement with sufficient particularity to enable the witness to identify the statement and is afforded an opportunity to admit or deny having made it.'
"Rule 613(b), Ala.R.Evid."
Rutledge v. State, 680 So.2d 997, 999-1000 (Ala.Cr.App.1996).
Although the defense did elicit from William Day on cross-examination that Day did not tell the district attorney what the appellant had said until the week before the trial, the record reflects that neither witness was questioned on cross-examination as to whether they had told Investigator Sandlin of the appellant's threats to kill the victim. Accordingly, because the proper predicate had not been established, the trial court did not err in its ruling.

IX.
The appellant alleges that the trial court erred to reversal in not charging the jury on the offenses of intentional murder, reckless murder, and criminally negligent homicide. It is unclear whether the appellant preserved his allegation that the trial court erred in not charging on noncapital intentional murder; nevertheless, because this is a case where the death penalty has been imposed, we must review the trial court's refusal to charge on intentional murder to determine whether it constitutes plain error. Rule 45A, Ala.R.App.P.
"A capital murder defendant is entitled to a charge on a lesser included offense only where there is a reasonable theory from the evidence that would support such a charge." Ex parte Trawick, 698 So.2d 162, 177 (Ala.), cert. denied, 522 U.S. 568, 118 S.Ct. 568, 139 L.Ed.2d 408 (1997). The appellant claims that a charge on noncapital intentional murder was warranted because "[t]he jury could have concluded from the evidence Appellant intentionally caused the death of the deceased, but did not intend to kidnap him." Specifically, he suggests that the jury "may have believed that Appellant intended to take his [the victim's] life at the trailer, and thought he had done so, but did not have the intent to kidnap him as defined by the court in its oral jury charge." (Appellant's brief, p. 46.) There is no merit to this assertion.
*190 The defense's theory of the case was that the appellant did not intend to kill the victimthat he only meant to scare him. The appellant confessed to beating and binding the victim, and then taking him to the river where, he claimed, he left the victim alive beside the river. The victim died from drowning. No logical interpretation of the evidence would support a conclusion that the appellant intended to kill the victim, but that he did not intend to kidnap him, nor would the evidence support a reasonable inference that the appellant intentionally killed the victim before taking him to the river. Accordingly, the trial court did not err in refusing to charge the jury on the offense of noncapital intentional murder, as defined by 13A-6-2(a)(1), Code of Alabama 1975. See Trawick, supra.
Likewise, the evidence did not support a charge on reckless murder, as defined by § 13A-6-2(a)(2), Code of Alabama 1975, because the appellant's actions were directed solely at the victim. Dallas v. State, 711 So.2d 1101, 1108 (Ala.Cr.App. 1997), aff'd, 711 So.2d 1114 (Ala.1998).
The trial court did not err in failing to charge on the offense of criminally negligent homicide, as defined by § 13A-6-4, Code of Alabama 1975. Given the evidence that the appellant severely beat the victim (the wounds from the beating alone were severe enough to cause death), that he bound the victim's legs, hands, and head, that he dumped the victim's barely clad body in a river in extremely cold weather, and that he left the area while the victim was in the river without obtaining any help, it cannot be said "that the appellant failed to perceive that the victim might die as a result of his action." Akin v. State, 698 So.2d 228, 234 (Ala.Cr.App. 1996), cert. denied, 698 So.2d 238 (Ala. 1997). See also Dallas, supra.

X.
The appellant contends that the trial court erred to reversal in allowing kidnapping to be considered an aggravating circumstance. Specifically, he argues that because kidnapping is an element of the offense for which he was convicted murder during a kidnapping in the first degree, see § 13A-5-40(a)(1)the consideration of kidnapping as an aggravating circumstance violated his Fifth Amendment right to protection against double jeopardy.[6] We disagree.
Section 13A-5-50, Code of Alabama 1975, provides:
"The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence. By way of illustration and not limitation, the aggravating circumstance specified in Section 13A-5-49(4) shall be found and considered in determining sentence in every case in which a defendant is convicted of the capital offenses defined in subdivisions (1) through (4) of subsection (a) of 13A-5-40."[[7]]
(Emphasis added.) This Court has stated:
"Section 13A-5-50 clearly provides that a jury may consider an element of capital murder as an aggravating circumstance if that element is listed in § 13A-5-49. This court has repeatedly *191 held that the use of an element of capital murder as an aggravating circumstance does not punish a defendant twice for the same offense. Burton v. State, 651 So.2d 641 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995).
"`"A capital punishment scheme, under which the same felony may form the basis of an essential element of the crime and an aggravating circumstance for consideration by the jury in recommending a sentence, does not constitute a denial of the guarantee against double jeopardy." Fortenberry v. State, 545 So.2d 129, 142 (Ala.Cr.App.1988), aff'd, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990).'
"Kuenzel v. State, 577 So.2d 474 at 488."
George v. State, 717 So.2d 849, 857 (Ala.Cr. App.1997), aff'd, 717 So.2d 858 (Ala.1998). (Emphasis added.) See also Hutcherson v. State, 677 So.2d 1174, 1201 (Ala.Cr.App. 1994), rev'd on other grounds, 677 So.2d 1205 (Ala.1996). Furthermore, § 13A-5-45(e), Code of Alabama 1975, states:
"At the sentence hearing the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances. Provided, however, any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing."
(Emphasis added.)
Accordingly, the trial court's allowing kidnapping to be considered an aggravating circumstance did not subject the appellant to double jeopardy.

XI.
The appellant contends that he is entitled to a new sentencing hearing because, he argues, the trial court's instruction on the aggravating circumstance that the capital offense was committed during a robbery was incomplete. Specifically, the appellant claims that the trial court's instruction on robbery was erroneous because the trial court did not define the term "theft," which is an element of robbery.
The record reflects that the trial court instructed the jury at the sentencing hearing on the aggravating circumstances, in pertinent part, as follows:
"The aggravating circumstances you may consider in this case, if you find from the evidence they have been proven beyond a reasonable doubt, are as follows:
"That the Defendant was previously convicted of a felony involving the use of threatExcuse me, involving the use or threat of violence to another person.
"Number two, the capital offense was committed while the Defendant was engaged in or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery.

"The next one you may consider is the same verbiage completely, except in the place of robbery, insert kidnapping.
". . . .
"The capital offense was especially heinous, atrocious, or cruel, compared to other capital offenses. The term `heinous' means extremely wicked or shockingly evil. The term, `atrocious' means outrageously wicked and violent. The term `cruel' means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others.
"What is intended to be included in these aggravating circumstances are those cases where the actual commission of the crime of capital offensesBottom line is saying the term especially heinous has to be shown. All capital offenses have some heinousness, some atrociousness, some cruelty connected with them. *192 This circumstance sets out that it has to be especially heinous, especially atrocious, and especially cruel."
(R. 1466-68.) (Emphasis added.) Later in its charge to the jury, the trial court defined robbery as follows:
"A person commits the crime of robbery in the first degree if he uses or threatens to use or threatens the use of forceI'm sorryagainst the owner of personal property. And, while in the course of committing a theft of personal property with intent to overcome his physical power of resistance, in order to compel his acquiescence in the taking of the personal property, and in the course of said theft, he intentionally causes serious physical injury or death to a person."
(R. 1476.)
At the conclusion of the court's charge, defense counsel entered his objections to the charge, arguing, in part, "I don't think the Court informed the jury of robbery in that he forgot to tell them about the theft, what theft means." (R. 1483-84.) The trial court responded, "They know what robbery is and know what theft is." (R. 1484.)
The state concedes in its brief to this court that the trial court "may have cut corners in the wording of his instructions," but it argues that the trial court did not commit prejudicial error. (State's brief, p. 60.) The state maintains that the trial court "could have done more[it] could have read all the elements making up the offense under Ala.Code § 13A-5-40(2) but what [it] did was sufficient to allow the jury to intelligently deliberate and decide whether committing the murder during the commission of a robbery was proven by the evidence to be an aggravating circumstance." (State's brief, p. 60.) We disagree.
This Court has stated:
"`After hearing the evidence and the arguments of both parties at the sentence hearing, the jury shall be instructed on its function and on the relevant law by the trial judge.' Alabama Code 1975, § 13A-5-46(d). In instructing a jury that it may consider the aggravating circumstance or circumstances defined in § 13A-5-49(4), the trial court should also give the jury the statutory definition of the underlying felony or felonies involved (rape, robbery, burglary, or kidnapping). The jury instructions given at the end of the sentence hearing should include, among other things, `[e]xplanations of the aggravating circumstances relied upon by the prosecution.' [J.] Colquitt, [The Death Penalty Laws of Alabama,] 33 Ala.L.Rev. [213] at 322-23 [(1982)].
"On December 6, 1982, the Supreme Court of Alabama issued an order `recommending' the use of the pattern jury instructions for the trial and sentencing aspect of cases tried under Alabama's 1981 death penalty act (§ 13A-5-40 et seq.) which were prepared by the Alabama Bar Institute for Continuing Legal Education. In a footnote to the aggravating circumstance defined by § 13A-5-49(4) and here under consideration, the proposed instructions state: `In the fourth aggravating circumstance, only the felony relevant to the facts should be read to the jury. If the jury was not instructed on the elements of that felony during the guilt stage, it should be done at this time.' Proposed Pattern Jury Instructions for Use in the Guilt Stage of Capital Cases Tried Under Act No. 81-178, 84, n. 4 (1982)."
Duren v. State, 507 So.2d 111, 114-15 (Ala. Cr.App.1986), aff'd, 507 So.2d 121 (Ala.), cert. denied, 484 U.S. 905, 108 S.Ct. 249, 98 L.Ed.2d 206 (1987) (emphasis added).
Theft is an element of robbery. As we have stated, "[r]obbery includes the crime of theft, by its definition `plus the element of force or threat of force.'" Hyter v. State, 545 So.2d 194, 197, (Ala.Cr.App. 1988), quoting Ramsey v. State, 441 So.2d 1065, 1067 (Ala.Cr.App.1983) (emphasis added). See also § 13A-8-40 through-43, *193 Code of Alabama 1975. The term "theft" is defined by statute. Section 13A-8-2(1), Code of Alabama 1975, provides that "[a] person commits the crime of theft of property if he knowingly obtains or exerts unauthorized control over the property of another, with intent to deprive the, owner of his property." See also Proposed Pattern Jury Instructions for Use in the Guilt State of Capital Cases Tried Under Act No. 81-178 (1982).[8] Because the term "theft" is defined by statute, and because the jury had not already been instructed during the guilt phase of the trial on the offense of robbery and all its elements, including the definition of theft, the trial court should have instructed the jury on the statutory definition of "theft" during its sentencing instructions. Compare Williams v. State, 710 So.2d 1276, 1341 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), ("`[w]hen a term is included in a statute relevant to a case, and that term is not defined by statute, whether it is necessary for the trial court to define the term for the jury hinges on the facts of the case'") (emphasis added; citation omitted).
In Lawhorn v. State, 581 So.2d 1159 (Ala.Cr.App.1990), aff'd, 581 So.2d 1179 (Ala.), cert. denied, 502 U.S. 970, 112 S.Ct. 445, 116 L.Ed.2d 463 (1991), this Court addressed a situation where the trial court's sentencing instructions were incomplete because the instructions "did not contain a limiting definition of the `especially heinous' aggravating circumstance." 581 So.2d at 1174. In that opinion, we said:
"Although we consider the jury's finding of the aggravating circumstance to be invalid because it was not guided by sufficient instruction, we find no imperative to reverse and remand this cause for resentencing. In Clemons v. Mississippi, 494 U.S. 738, 738, 110 S.Ct. 1441, 1441, 108 L.Ed.2d 725 (1990), the Court held that `the Federal Constitution does not prevent a state appellate court from upholding a death sentence that is based in part on invalid or improperly defined aggravating circumstances either by reweighing of the aggravating and mitigating evidence or by harmless error review.'
"Our supreme court held, in Ex parte Williams, 556 So.2d 744 (Ala.1987), that the trial court, upon its finding that an aggravating circumstance on which the jury was instructed was invalid, cannot cure such error by disregarding that circumstance and finding, upon reweighing, that the remaining aggravating circumstances outweigh the mitigating evidence. In Williams, the jury had been improperly instructed that it could consider the fact that the capital offense was committed by a person under sentence of imprisonment, § 13A-5-49(1); however, it was subsequently established that the appellant was not on probation or parole at the time the crime was committed. In holding that the sentence of death could not be affirmed, our supreme court reasoned as follows:
"`The Court of Criminal Appeals reasoned that, because the trial court, as the ultimate sentencing authority, did not consider illegal evidence ("the incorrect aggravating circumstance") in the sentencing hearing, the trial *194 court's error in permitting the jury to consider such evidence in arriving at its recommendation of the death sentence was harmless. The basic flaw in this rationale is that it totally discounts the significance of the jury's role in the sentencing process.
"`The legislatively mandated role of the jury in returning an advisory verdict, based upon its consideration of aggravating and mitigating circumstances, cannot be abrogated by the trial court's errorless exercise of its equally mandated role as the ultimate sentencing authority. Each part of the sentencing process is equally mandated by the statute (§§ 13A-5-46, -47(e)); and the errorless application by the court of its part does not cure the erroneous application by the jury of its part. For a case consistent with our holding, see Johnson v. State, 502 So.2d 877 (Ala.Cr.App.1987). To hold otherwise is to hold that the sentencing role of the jury, as required by statute, counts for nothing so long as the court's exercise of its role is without error.
"`We emphasize that our holding that the Court of Criminal Appeals erred in its application of the harmless error rule is based upon independent state law grounds and upon statutory construction. We reverse as to the judgment of sentence and remand to the Court of Criminal Appeals with instructions to remand this cause for a new sentencing hearing before a jury and before the court as required by law.'
"Id. at 745 (emphasis in original).
"In consideration of this rationale, we presume that this court, in reviewing the propriety of a death sentence after a jury recommendation based, in part, on an invalid aggravating circumstance, cannot resort to the first analysis recognized by the Maynard Court: a reweighing, by the appellate court, of the valid aggravating and the mitigating circumstances.
"However, we find no impediment to prevent us from reviewing the insufficient instruction for harmless error. The Clemons Court, in discussing this alternative stated the following:
"`Even if under Mississippi law, the weighing of aggravating and mitigating circumstances were not an appellate, but a jury function, it was open to the Mississippi Supreme Court to find that the error which occurred during the sentencing proceeding was harmless. See, e.g. Satterwhite v. Texas, 486 U.S. 249, 108 S.Ct. 1792, [100 L.Ed.2d 284] ... (1988). As the plurality in Barclay v. Florida, [463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983)], opined, the Florida Supreme Court could apply harmless error analysis when reviewing a death sentence imposed by a trial judge who relied on an aggravating circumstance not available for his consideration under Florida law:
"`"Cases such as [those cited by the petitioner] indicate that the Florida Supreme Court does not apply its harmless-error analysis in an automatic or mechanical fashion, but rather upholds death sentences on the basis of this analysis only when it actually finds that the error is harmless. There is no reason why the Florida Supreme Court cannot examine the balance struck by the trial judge and decide that the elimination of improperly considered aggravating circumstances could not possibly affect the balance.... `What is important ... is an individualized determination on the basis of the character of the individual and the circumstances of the crime.' Zant [v. Stephens, 462 U.S. 862], at 879, [103 S.Ct. 2733, 2744, 77 L.Ed.2d 235 (1983)] (emphasis in original). Id., [463 U.S.] at 958, 103 S.Ct., at 3429."'

*195 "494 U.S. at 751, 110 S.Ct. at 1450.
"In Alabama, `the harmless error rule does apply in capital cases at the sentence hearing.' Ex parte Whisenhant, 482 So.2d 1241, 1244 (Ala.1983). However, it `is to be applied with extreme caution in capital cases,' and this caution must be observed when reviewing error in the penalty phase, for `[a]fter all, it is the penalty which distinguishes these cases from all other cases.' Ex parte Whisenhant, 482 So.2d 1247, 1249 (Ala. 1984).
"To determine whether the trial court's failure to instruct properly was harmless error, the Clemons Court suggests one of two inquiries: (1) whether beyond reasonable doubt the sentence would have been the same had the `especially heinous' circumstance not been considered by the jury at all, or (2) whether beyond reasonable doubt the result would have been the same had the circumstance been properly defined in the jury instructions. See also Henry v. Wainwright, 721 F.2d 990, 995 (5th Cir. 1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984) (wherein the court, in holding harmless the trial court's failure to instruct that aggravating circumstances must be found beyond a reasonable doubt, stated that `[f]or the failure to give the instruction to be harmless, the evidence must be so overwhelming that the omission beyond a reasonable doubt did not contribute to the verdict').
"For purposes of our review of this case, we employ the second Clemons inquiry. There is no question, at all, that, had the jury been properly instructed, it would still have returned a recommendation of death because the facts presented to the jury established, beyond any doubt, that this crime was especially heinous, atrocious, or cruel when compared to other capital offenses. The evidence of this circumstance is overwhelming; the facts so conclusively establish it, that no rational jury, properly instructed, could have found otherwise. The evidence is unconflicting that appellant directly participated in a conscienceless, pitiless, and torturous murder. Berry's last minutes were obviously filled with terror, fear, and knowledge that his death was imminent, and he experienced a high degree of prolonged pain before his death. All of this was accomplished by appellant with complete indifferencecomplete indifference to Berry's pain and terror and complete indifference to the value of human life, which he found to be worth $ 50. Clearly, this evidence sets this crime apart, for the degree of heinousness, atrociousness, and cruelty of this offense exceeds that which would be common to all capital offenses. By any standard acceptable to civilized society, this crime was outrageously wicked and shockingly evil. In fact, appellant admitted, during the sentencing phase, that as the victim lay entangled in the underbrush and unable to talk, but gurgling, he repeatedly shot the victim and, at the time, did not care whether the victim died or not.
"We note that this situation does not involve the jury's consideration of misleading, inaccurate, or illegal information or evidence. Rather, it is a case where the aggravating circumstance, overwhelmingly supported by admissible evidence, was rendered invalid because it was unconstitutionally presented to the jury. We find that the jury's improper consideration of this aggravating circumstance and possibly improper consideration by the trial court did not render appellant's sentencing fundamentally unfair. It is unnecessary to vacate appellant's sentence because we are convinced beyond a reasonable doubt that, had the circumstances been properly narrowed, the jury would have recommended the same sentence and the trial court would have imposed the same sentence. We hold this, even in the face of our recognition of the utmost importance of insuring that a death sentence not be based on arbitrary and capricious *196 action. While we, in theory, would be very hesitant to find harmless error in the submission to the jury of an unconstitutionally defined aggravating circumstance, we find that the facts of this case support such an application beyond a reasonable doubt."
581 So.2d at 1175-77. (Footnote omitted.)
The issue before this Court is whether the trial court's error in failing to define "theft" as an element of robbery was harmless. Employing either test set forth above"whether beyond reasonable doubt the sentence would have been the same had the [robbery aggravating] circumstance not been considered by the jury at all," or "whether beyond reasonable doubt the result would have been the same had the circumstance been properly defined in the jury instructions" 581 So.2d at 1177 we cannot say that the trial court's failure to define "theft" was harmless.
Theft is an intentional crime. It requires that the perpetrator "knowingly obtain or exert unauthorized control over the property of another, with intent to deprive the owner of his property." § 13A-8-2(1), Code of Alabama 1975. (Emphasis added.) The prosecution presented evidence at the guilt phase of the trial, in the form of the appellant's statement to the investigators, that the appellant took a gun belonging to the victim. Specifically, the appellant told the investigators that he took the gun after it fell out of the victim's pocket during a scuffle. The prosecution argued at the sentencing phase that the jury should consider the aggravating circumstance that the capital offense occurred during a robbery. Specifically, the prosecution argued in its opening arguments:
"Robbery, he robbed the [victim] of something. Robbery does not have to be of money from your pocketbook....[R]obbery of the firearm. It has been shown to you in evidence that a firearm was taken and taken during the course of beating and that is robbery. We contend to you that is robbery and that is another aggravating circumstance that you can consider and weigh in your mind as one of the factors as to whether or not your recommendation should be death or life without parole."
(R. 1410.) The prosecution argued in its closing argument at the sentencing phase:
"In addition, we have presented other aggravating circumstances. One of them is robbery. That robbery deals with taking [Jessie Price's] gun in a violent confrontation. The evidence of that you can consider is the Defendant's statement. And, in that statement, he said that he took the gun. Okay? That's another aggravating circumstance. I submit to you that has been proven beyond a reasonable doubt, that aggravating factor."
(R. 1449.)
The appellant's counsel responded to the prosecution's remarks in his closing argument at the sentencing phase. Defense counsel suggested that the appellant did not have the intent to take the victim's gun. Specifically, defense counsel argued:
"[The] prosecutor asked you to believe that this was a robbery. This case is really not about a robbery. They are saying that is [an] aggravating circumstance. This is really not a case about robbery but about someone going to someone's house and you know the facts. It wasn't robbery. Taking the gun is what they talked about. But, the gun is really not significant. I think everyone can agree he didn't have the intent to take this man's gun when he went there and common sense tells you that you wouldn't jump a person if you knew he had a gun. It's not about a gun. They've got to tell you those things to try to get you to consider them."
(R. 1454.) (Emphasis added.)
In his rebuttal closing argument, the prosecution countered:
"He robbed him of a gun. Whether or not robbery was his intent when he went in the house, is of no consequence. If he forcibly took that gun from him or *197 through threat took it from him, then he is guilty of robbery and you can consider that. He hit him in the head with a pipe and then he took his gun. Theft of the gun."
(R. 1457.)
Although there was apparently no dispute that the appellant took the victim's gun, whether the appellant acted with the requisite intent to commit a theft when he took the gun was disputed, as counsel's arguments suggested. Thus, in order for the jury to properly consider the aggravating factor that the capital offense was committed during a robbery, an understanding of all the elements of robbery was essential, especially the term "theft."
We recognize that there are instances where, even though a term has been defined by statute, the failure to define that term for the jury does not constitute reversible error; however, in those instances, the term is not susceptible to different interpretations. See, Roberts v. State, 735 So.2d 1244, 1256-57 (Ala.Cr.App.1997) ("[t]he word `during,' even though it is specifically defined by statute as it relates to capital murder cases, is not legal jargon; it is a common term that can be understood by average jurors in its common usage"). In this case, however, we cannot say that the term "theft" is subject to only one interpretation and that it "can be understood by average jurors in its common usage." As the appellant suggests in his brief to this court, "[m]any people say their house was `robbed' or their car was `robbed,'" when the crime should more appropriately be called a theft. (Appellant's brief, p. 50.) It is not farfetched that an uninformed juror could have thought that the appellant's mere taking of the gun from the floor after it allegedly fell from the victim's pocket, without any sort of criminal intent, constituted a theft, or, at the other extreme, an uninformed juror could have thought that because the appellant claimed to have gotten the gun from the floor after it fell from the victim during a scuffle, that his act did not constitute a theft. Without an understanding of the requisite intent, it would be difficult for a juror to properly evaluate whether the appellant's taking of the gun constituted a "theft," as that term is defined by statute.
Admittedly, the temptation is great to dismiss the trial court's error by simply concluding that even if the trial court had not charged on the aggravating circumstance that the capital offense was committed during a robbery, or if the trial court had correctly instructed the jury on that aggravating circumstance, the jury would have reached the same result; however, we simply do not know how the jurors weighed this aggravating circumstance. We do not know whether the jurors even found the existence of the aggravating circumstance that the capital offense was committed during a robbery, and, if they did, what weight the jurors gave this aggravating circumstance in light of the other aggravating circumstances and the mitigating evidence. Most troubling, because the jurors were not instructed on the meaning of the term "theft," we cannot be assured that they did not find the existence of the aggravating circumstance that the capital offense was committed during a robbery on less proof than is required by law. Accordingly, we simply cannot conclude that the trial court's error in not correctly charging the jury on this aggravating circumstance was harmless.
"[T]he sentencing stage is a `due process hearing of the highest magnitude,' Richardson v. State, 376 So.2d 205, 224 (Ala. Cr.App.1978), aff'd, 376 So.2d 228 (Ala. 1979), and ... a reviewing court must carefully analyze the jury instructions to determine if the trial court has fulfilled its duty to properly inform the jury. Proper instructions are absolutely indispensable if the jury is to effectively perform its role in this crucial proceeding."
Ex parte Stewart, 659 So.2d 122, 127 (Ala. 1993). (Footnote omitted.)
*198 The fact that the trial court did not find the existence of the aggravating circumstance that the capital offense was committed during a robbery does not render its previous mistake in failing to charge on all the elements harmless. "`To hold otherwise is to hold that the sentencing role of the jury, as required by statute, counts for nothing so long as the court's exercise of its role is without error.'" Lawhorn, 581 So.2d at 1176, quoting Ex parte Williams, 556 So.2d 744 (Ala.1987).
Accordingly, the appellant's sentence is reversed, and this cause is remanded to the trial court for new sentencing proceedings. We pretermit discussion of the sentencing issues presented in parts XVI(g) and (f), XX, and XXI of the appellant's brief because they should not arise again.

XII.
The appellant maintains that the trial court erred to reversal in refusing to give six of his requested jury charges during the sentencing phase of the trial. Specifically, the appellant claims that the trial court erred in failing to give the following charges:
Charge 18: "You may consider any mitigating factor whether or not it has been presented."
Charge 19: "You may consider as mitigating factors, the fact that Rayford Hagood has been an exceptional prisoner, that he is in bad health, and that he has a family which loves him and who he loves."
Charge 20: "You may consider as a mitigating factor, that Rayford Hagood has been regularly attending religious services."
Charge 21: "You may consider as a mitigating factor, Rayford Hagood's respectable demeanor during these proceedings."
Charge 22: "You may consider as a mitigating factor that Rayford Hagood believed that the children in the decedent's household were being mistreated."
Charge 23: "You may consider as a mitigating factor that Rayford Hagood believed that the decedent took the family's food stamps with him when he went out of town and left the family without food."
(C.R.80-81.)
The record reflects that the trial court thoroughly charged the jury regarding the statutory mitigating circumstances enumerated in § 13A-5-51, Code of Alabama 1975. The trial court then instructed the jury that it was not limited to considering only those mitigating factors set forth in the statute. It explained to the jury that it could consider in mitigation any evidence presented during both phases of the trial. The trial court was not required to read each of the appellant's requested charges on mitigating evidence. "This Court has held that the trial court does not have to instruct the jury from a list of specific nonstatutory mitigating circumstances provided by the defendant." Brown v. State, 686 So.2d 385, 403 (Ala.Cr.App.1995), aff'd, 686 So.2d 409 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997), citing Cochran v. State, 500 So.2d 1161 (Ala.Cr.App.1984), aff'd in part, rev'd in part, 500 So.2d 1179 (Ala.1985).
Accordingly, no reversible error occurred in the trial court's refusal to give the appellant's requested charges on mitigation evidence.

XIII.
The appellant claims that the trial court erred to reversal in refusing to allow him to try on, in the presence of the jury, a pair of shoes that had previously been introduced into evidence during the state's case. We disagree.
The record reflects that at the conclusion of the appellant's presentation of evidence at the guilt phase of the trial, the following occurred:

*199 "BY MR. TATUM [defense counsel]: Your Honor, may we approach the bench?
"BY THE COURT: Okay.
"BY MR. TATUM: I would like for Mr. Hagood to try on the shoe that has been admitted into evidence, in the presence of the jury, and we want the Court's instruction as to exactly how we should handle it.
"BY MR. BAKER [prosecution]: If he is called to the witness stand, he becomes If he is sworn in he becomes a witness and he is subject to cross-examination.
"BY MR. TATUM: We're not calling him to the witness stand. It is strictly to showNo testimony, no statements made.
"BY THE COURT: No. Denied.
"BY MR. GUSTIN [defense counsel]: We ask that [a] defendant be allowed to stand and to demonstrate clothing and to speak words of identification in front of the jury. [This] is the exact same thing and if the Court does not allow this demonstration, we believe it will be reversible error.
"BY THE COURT: Get me the law....
"JURY OUT

"BY MR. BAKER: I would like to go on the record. It's obvious from voir direThe record will reflect that the District Attorney made an objection to Mr. Hagood's putting his feet in front of the jury and I said`They have no socks on and they are swollen.' I do not know if it is diabetes, circulatory problems or what.
"I suggest to the Court that based on that and observation of his swollen feet, that trying these shoes on with his feet swollen to, Lord knows what size. I further object to any demonstration based upon that. By having him to do this, especially with swollen feet, denies the State the right to cross-examine him.
"BY MR. ADAIR [assistant prosecutor]: The Defense is the one who brought up the whole suggestion of his feet being swollen and in addition, I've been told from the sheriff's office that they have had to take him to Birmingham because of circulatory problems in his feet and that they swelled up one time to twice their normal size.
"BY MR. GUSTIN: This is demonstrative evidence allowed by the law.
". . . .
"BY THE COURT: Does the Defense intend to let Mr. Hagood try on the black tennis shoes; is that it?
"BY MR. TATUM: That's correct. Marked as State's Exhibit # 40.
"BY THE COURT: And, the Defense, yesterday, tried them on him; is that correct?
"BY MR. TATUM: Yes.
"BY THE COURT: And, did not notify the State that this experiment was to be done?
"BY MR. TATUM: We didn't do it until after court recessed and everyone was gone. The shoes have been available and the State has had the opportunity. They have gotten hair samples from this man. They got blood samples from him. They had every opportunity to do the same type of demonstrative test with him if they had so chosen. They have never requested to do it. They have had the same opportunity.
"BY MR. BAKER: We're talking about whether or not they complied with discovery. They were in the office yesterday afternoon after court, both of them, and we were not notified. I don't know if that was after the test or before. I presume it was after.
"BY THE COURT: Also, the Court notes that Mr. Hagood has some type foot problem and that his feet were elevated at the first of the trial.

*200 "BY MR. TATUM: We would point out that only one of his feet has a problem. The other one doesn't. But, it's still a matter of demonstrative aid and we just request permission to be allowed to do this demonstration to the jury. The D.A. has had ample access to Mr. Hagood to get any type sample or do any type of testing that they wanted. That's what the law is for.
"BY THE COURT: The law says that you are supposed to give them notice of any testing you've done.
". . . .
"BY MR. TATUM: Well, this is not a scientific test and we did this yesterday afternoon after court. They had the same opportunity to do the same thing.
"They made such an issue about these shoes yesterday and about the sand yesterday until we got together and decided, let's let him see if he can wear these shoes.
"Mr. Baker's harsh cross-examination of Mr. Weaver about the sand from the shoes and the sand from the floorboard, that's when we decided to see if he could put the shoe on. They had the same right. They've never done it. We've decided to.
"BY MR. BAKER: I understand Mr. Tatum is angry because he has violated the Court's discovery order.
". . . .
"... He has only told us about this demonstration this morning as they are fixing, apparently, to call Mr. Hagood for demonstration purposes. We were not notified of it. This is a matter which from the very beginning, in voir dire to the jury, I said, `I object to the Defendant's feet. They apparently are swollen from diabetes or circulatory problems.'
"I object to the jury panel even seeing it because it is simply something to try to elicit sympathy. They are obviously swollen feet from some type disease or condition.
"It should not be admitted on the reason that the Defense has failed to comply with your discovery order. What they intended to do has been intentionally kept from the State and used as bushwhack evidence on us this morning. It will require the State, now, to do its own investigation and talk to doctors and see what medications he is on; talk to jailers; talk to the sheriff, at close to the end of the trial. In addition, to have a man with swollen feet try on shoes approaches mockery.
"Alabama Rules of Evidence, Section 102 of the new rules, said these rules are being administered to get at the truth and justice and this bushwhack attack is nothing more than a sham and a mockery of justice.
"I object to its going into evidence and I suspect if it does, the jury is going to see through it.
"BY THE COURT: I sustain the objection."
(R. 1267-73.)
After a charge conference, the following occurred:
"BY MR. TATUM: ....We would proffer that if Mr. Hagoodif the defendant were allowed to make the demonstrative showing it would show that the shoes marked as State's Exhibit # 40 would not fit either of his feet, including the foot that has no medical problems, that is natural....
". . . .
"BY MR. BAKER: I object to the Defense and there has been no evidence whatsoever that he does not have any medical problems. In fact, there has been an admission that the feet are swelled.
"Let the record reflect that the Defendant is in court with flip-flop shoes on, the type that we wear to the beach and what appears to be bandages or some type of medical sock and has been that way the whole trial. It is so severe that the State objected to the Court which *201 overruled us, to even let the jury see his feet.
"BY MR. TATUM: The jury can see his feet for themselves.
"BY THE COURT: I will accept the proffer. The denial of it is based on your performing the experiments and not letting the D.A. know, which would require him to confer with physicians, jailers, and on and on and on to rebut it.
"BY MR. TATUM: We would submit, for the record, that jailers are available. They work for the sheriffs office and any physicians that would examine Mr. Hagood in the jail are on the jail staff and readily available.
"In fact, Dr. Klein is the jail physician and he is on their payroll and readily available. To deny the Defendant the right to make this proffer without allowing a break or recess
"BY THE COURT: Overruled. I've ruled on it.
"BY MR. ADAIR: He has been seeing a specialist in Birmingham for the last several months."
(R. 1278-80.)
The appellant claims that the requested in-court demonstration was not a "scientific experiment," and that, therefore, he was not required to comply with the portion of Rule 16, Ala.R.Crim.P., regarding notice to the opposing party of the results of out-of-court scientific experiments. He argues:
"Rule 16.2 and its counterpart Rule 16.1 are designed to give the opposing party notice of potential expert testimony which involves scientific experimentation. The purpose of the rule is to allow the opposing party the opportunity to have their own expert evaluate the results and process of the experiment and in some cases duplicate the experiment themselves. Because of this, [the appellant] would argue that the rule is aimed at situations which would necessarily involve facts which would not be in the knowledge of laymen and where the jury would benefit from testimony of someone trained in the field of study who possessed special knowledge.... The trying on of shoes is not something which would require a jury to hear expert testimony and it was error for the trial court to not allow the demonstration."
(Appellant's Reply Brief, 5-6.)
"As a general proposition, the allowance or disallowance of an experiment in open court in the presence of the jury is committed to the discretion of the trial judge. Both the scope and extent of the experiment, if allowed, rest within sound discretion and will not be reversed upon appeal unless that discretion has been grossly abused. It should be recognized that it is everyday practice for Alabama trial judges to permit an experiment to be made in the courtroom in the presence of the jury if it reasonably appears that the experiment will aid the jury in ascertaining the truth. Such falls well within the power vested in the trial judge to exercise reasonable control over the `mode and order of ... presenting evidence.' If the experiment replicates some phenomenon then the in-court conditions of the experiment must be substantially the same as those existing during the out-of-court event."
C. Gamble, McElroy's Alabama Evidence, § 81.02(1) (5th ed.1996), quoting, in part, Ala.R.Evid. 611(a). (Emphasis added; footnote omitted.)
The state presented evidence that the shoes that were found in the place where the appellant had been living bore similar characteristics to a cast of a footprint left on the bank of the river where the victim's body was located. From this, the jury could have reasonably inferred that the appellant had been on the riverbank in order to put the victim's body in the river. Apparently, the appellant sought to perform the in-court demonstration in order to show that the shoes did not fit him, and therefore to cast doubt on the state's evidence that he had intentionally placed the *202 victim in the river; he told investigators that he left the victim alive at the top of the riverbank.
Whether the demonstration could properly be deemed a "scientific experiment," as that term is used in Rule 16, Ala. R.Crim.P., is not relevant to the disposition of this issue. Rather, the trial court correctly prohibited the demonstration because it would have been of little value in aiding the jury in ascertaining the truth whether the appellant was wearing the shoes on the night the victim died and, ultimately, whether the appellant intentionally placed the victim in the river. There was little dispute that at the time of the trial that the appellant's feet were swollen as a result of a health problem and that the swelling could have prevented the shoes from properly fitting him at the time of the desired demonstration; however, there was no evidence of the condition of the appellant's feet on the night the victim died, when the shoes were supposedly worn. Thus the appellant failed to establish that the in-court conditions were substantially similar to the out-of-court event. Accordingly, we find no abuse of discretion in the trial court's refusal to permit the in-court demonstration. See White v. State, 546 So.2d 1014, 1032 (Ala.Cr.App.1989) ("the State failed to prove that the capabilities of the telephone used in the courtroom demonstration were substantially similar to those of the telephone used by White on the night of the murder"). Moreover, given the timing of the desired demonstration, the trial court did not abuse its discretion in not continuing the trial in order for the state to conduct its own investigation into the matter.

XIV.
The appellant alleges that comments by the prosecution and the trial court during the trial diminished the importance of the jury's role in sentencing, in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). In support of his contention, he argues that the prosecution inappropriately stated during voir dire and during opening and closing arguments at both the guilt phase and the sentencing phase of the trial that the jury's verdict was a recommendation. The appellant maintains that the error was compounded by the fact that the trial court also referred to the jury's verdict as a recommendation, and the verdict form stated that the verdict was a recommendation. The appellant argues that "[s]uch statements misled the jurors into believing their role was unimportant." (Appellant's brief, p. 59.)
"In Martin v. State, 548 So.2d 488 (Ala.Cr.App.1988), aff'd, 548 So.2d 496 (Ala.1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989), this Court reiterated the rule enunciated in Caldwell v. Mississippi, that the prosecutor could not mislead a jury to believe that, while it may impose a death sentence upon a defendant, the ultimate responsibility for determining the appropriateness of the death sentence lay elsewhere. The Martin Court stated as follows:
"`Under Caldwell v. Mississippi, 472 U.S. 320, [327], 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985), "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." However, the comments of the prosecutor and the instructions of the trial court accurately informing a jury of the extent of its sentencing authority and that its sentence verdict was "advisory" and a "recommendation" and that the trial court would make the final decision as to sentence does not violate Caldwell. "[C]omments which accurately explain the respective functions of the judge and jury are permissible under Caldwell `as long as the significance of [the jury's] recommendation is adequately *203 stressed.'" Harich v. Wainwright, 813 F.2d 1082, 1101 (11th Cir.1987). Here, neither the prosecutor nor the trial court misrepresented the effect of the jury's sentencing recommendation. The cases of Caldwell, supra; Mann v. Dugger, 817 F.2d 1471 (11th Cir.), vacated, 828 F.2d 1498 (1987); Adams v. Wainwright, 804 F.2d 1526 (11th Cir.1986), modified, Adams v. Dugger, 816 F.2d 1493 (11th Cir.1987); and Harich, supra, each involved a situation where the prosecutor and the trial court misled the jury as to its critical role in sentencing under state law. In Hooks v. State, 534 So.2d 329 (Ala.Cr.App.1987), this Court reviewed the decisions of other jurisdictions which have confronted this issue and concluded: "The trial judge's and the prosecutor's remarks clearly defined the jury's role in the sentencing scheme. Thus, the jury could not have been confused as to its responsibility in the sentencing process. The remarks made here were a correct statement of the law and did not tend to mislead or misinform the jury. Therefore, we conclude the remarks were not improper under Caldwell, supra."'
"548 So.2d at 494."
Travis v. State, 776 So.2d 819, 854 (Ala.Cr. App.1997). See also Price v. State, 725 So.2d 1003 (Ala.Cr.App.1997); Ex parte Taylor, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996); Mason v. State, 768 So.2d 981 (Ala. Cr.App.1998).
After reviewing the record in its entirety, as well as the context in which the allegedly inappropriate comments were made, we find that "there is `no reasonable possibility that the jury was misled, misinformed, or confused as to its critical role in sentencing under Alabama law.'" Price, quoting Taylor v. State, 666 So.2d 36, 51 (Ala.Cr.App.1994). "The prosecutor's comments and the trial court's instructions `accurately informed the jury of its sentencing authority and in no way minimized the jury's role and responsibility in sentencing.'" Weaver v. State, 678 So.2d 260, 283 (Ala.Cr.App.1995), rev'd on unrelated ground, 678 So.2d 284 (Ala.1996). Furthermore, the jury verdict form used in this case comports with the recommended verdict form. See Form 89, part III, Ala. R.Crim.P. Accordingly, the appellant is due no relief on this allegation.

XV.
We find no plain error in the trial court's failure to give, at the sentencing phase of the trial, the appellant's requested instruction number 12, which read:
"You are to assume that if you sentence Rayford Hagood to life imprisonment without the possibility of parole, he will spend the rest of his life in prison. Likewise, you are to presume that if you sentence Rayford Hagood to death, he will be executed by means of electrocution. You are to make no other presumptions."
(C.R.79.) This Court has previously held that the failure to give essentially the same charge did not constitute reversible error. Martin v. State, 548 So.2d 488, 493-94 (Ala.Cr.App.1988).

XVI.
The appellant claims that his conviction must be reversed because of prosecutorial misconduct. We disagree.

A.
During the state's direct examination of witness Loy Wayne Braswell, the owner of Braswell's Gun Shop, the prosecution elicited testimony that Braswell had sold the victim a pistol in December 1993. On redirect examination, the following occurred:
"Q [Prosecution]: Did he indicate to you why he was buying the gun?
"A: He
"BY MR. TATUM [defense counsel]: Objection, Your Honor.

*204 "BY THE COURT: Sustained."
(R. 1189.) The appellant argues that the prosecutions's question to Braswell sought to elicit improper hearsay evidence, and that the only purpose for asking the question was to improperly insinuate that the victim bought the gun to protect himself from the appellant. (Appellant's brief, Issue XVI, part A.)
The trial court sustained the appellant's objection to the question before the witness could answer the question. Accordingly, "there is no adverse ruling upon which error can be predicated as the trial court sustained the objection and defense counsel did not request further relief." Green v. State, 591 So.2d 576, 578 (Ala.Cr. App.1991). No reversible error occurred.
In a related vein, the appellant claims that the prosecutor improperly argued to the jury during closing arguments at the guilt phase of the trial that the victim had purchased a gun for protection. He alleges that this argument was not based on facts in evidence. (Appellant's brief, Issue XVI, part F.) We note that the appellant did not specifically object to this particular comment.
In evaluating the propriety of prosecutorial arguments, this Court has stated:
"`"This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful." Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).'
"Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
". . . .
"As the United States Supreme Court stated in Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986):
"`[I]t "is not enough that the prosecutors' remarks were undesirable or even universally condemned." The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).'
"(Citation omitted.)
"We must evaluate the comment in the context of the entire proceedings.
"`"Whatever is in evidence is considered subject to legitimate comment by counsel." Bankhead v. State, 585 So.2d 97 (Ala.Cr.App.1989), aff'd, 585 So.2d 112 (Ala.1991). See also Ward v. State, 440 So.2d 1227 (Ala.Cr.App. 1983). "The prosecutor has the right to present his impressions from the evidence. He may argue every matter of legitimate inference and may examine, collate, sift, and treat the evidence in his own way." ... Donahoo v. State, 505 So.2d 1067, 1072 (Ala.Cr.App.1986).'
"Williams [v. State], 601 So.2d [1062,] at 1072-73 [(Ala.Cr.App.1991)]. `"[C]ounsel in the trial of any lawsuit has the unbridled right (to be sure, duty) to argue the reasonable inferences from the evidence most favorable to his client."' Kuenzel, 577 So.2d at 492, quoting Ex parte Ainsworth, 501 So.2d 1269, 1270 (Ala.1986). (Footnote omitted.)... `"Counsel for the state and defendant are allowed a rather wide latitude in drawing their deductions from the evidence."` Kuenzel, 577 So.2d at 493, quoting Arant v. State, 232 Ala. 275, 279, 167 So. 540, 543 (1936)...."
Burton v. State, 651 So.2d 641, 651-52 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995). See *205 also, Mason v. State, 768 So.2d 981 (Ala. Cr.App.1998).
While the trial court did not allow the prosecution to elicit testimony from the gun store owner as to why the victim had purchased the gun, there was other evidence to support the prosecutor's conclusion that the victim bought the gun for protection against the appellant. Specifically, Johnny Stewart, Mildred Price's son-in-law, testified that the victim and the appellant had argued, and that the victim had purchased a gun for his protection. (R. 550-51.) In addition, Stewart testified that he (Stewart) told a member of the victim's family about the appellant's threats to kill the victim. (R. 549-50.) The prosecutor's argument was a legitimate inference from the evidence presented.

B.
The appellant claims that the prosecutor improperly argued his personal beliefs to the jury during closing arguments at the guilt phase of the trial. (Appellant's brief, Issue XVI, parts B and C.) In support of this assertion, he refers this Court to instances during the prosecutor's argument where the prosecutor had prefaced his remarks with phrases such as "I believe" or "I think." (R. 1296-97; 1341-42.)
"`While it is never proper for the prosecutor to express his personal opinion as to the guilt of the accused during closing argument, reversible error does not occur when the argument complained of constitutes mere expression of opinion concerning inferences, deductions and conclusions drawn from the evidence. See Woods v. State, 19 Ala.App. 299, 97 So. 179 (1923); Mitchell v. State, 50 Ala.App. 121, 277 So.2d 395, cert. denied, 291 Ala. 794, 277 So.2d 404 (1973); Mainor v. State, 339 So.2d 147 (Ala.Crim. App.1976).'
"Sams v. State, 506 So.2d 1027, 1029 (Ala.Cr.App.1986)."
Wilson v. State, 652 So.2d 778, 781 (Ala.Cr. App.1994).
We have examined both instances cited by the appellant, as well as the context of the comments in the entire closing argument, and we find no reversible error. The prosecutor was not expressing his personal opinion as to the appellant's guilt; he was merely giving his impression of the evidence. The fact that the prosecutor prefaced some of his comments with "I believe" or "I think," or some similar expression, does not render the comments improper.
"In Ex parte Rieber, 663 So.2d 999 (Ala.1995), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995), the Alabama Supreme Court stated:
"`Furthermore, we view those comments that the prosecutor prefaced with "I think," "I believe," "I feel," "I am satisfied," and "I have no doubt," as expressing his reasonable impressions from the evidence.... We note, however, that even if these comments were to be viewed as expressions of the prosecutor's personal opinions and, thus, as "crossing the line" as permissible argument, they, nonetheless, would not constitute reversible error.'
"See also, Boyd v. State, [Ms. CR-94-1523, January 17, 1997] 715 So.2d 825 (Ala. Cr.App.1997)."
Roberts v. State, 735 So.2d 1244, 1255 (Ala. Cr.App.1997). See also Mason v. State, 768 So.2d 981 (Ala.Cr.App.1998).
The appellant also claims that the prosecutor committed reversible error when he argued to the jury: "I apologize if my argument has offended anybody. Just like the defense believes strongly in their case, I believe strongly in this one." (Appellant's brief, Issue XVI, part E; R. 1340.) Again, the appellant claims that the prosecutor's statement was an improper expression of his personal opinion regarding the case. We disagree.
*206 The comment should be examined in the context in which it occurred. During the prosecutor's rebuttal closing argument at the guilt phase of the trial, the following transpired:
"[Prosecution]: After he bashed him in the head in his own home, laid in wait for him, like a lion would wait for an animal to come by, in the dead of the night after he hid his vehicle. After having an affair with his wife, knowing that if Jessie was out of the way that he could move in with her and they could have Jessie's check and that the child would draw a check off Jessie, too. He laid in wait there until he got out, a man in his own house, a man who had bought a gun because he had heard about all of Hagood's feelings about him. He is in his own house, humble as it may be.
"There has been a lot of us who have been poor in our lifetime and there is nothing wrong with it.
"BY MR. TATUM: Judge, I object at this time. Mr. Baker again is arguing and raising his voice in an obvious attempt to influence or raise the jury's emotions and this should be based on the facts and evidence and not on how loud he can scream and appeal to emotions.
"BY THE COURT: Overruled.
"BY MR. BAKER: Thank you, Judge.
"BY MR. TATUM: We object.
"BY THE COURT: Overruled.
"[Prosecution] I apologize if my argument has offended anybody. Just like the Defense believes strongly in their case, I believe strongly in this one.

"BY MR. GUSTIN: Your Honor, we have to object to the District Attorney expressing his belief in this case.
"BY THE COURT: Overruled.
"BY MR. GUSTIN: We except.
"[Prosecution]: Based on the evidence, ladies and gentlemen of the jury, based on the evidence."
(R. 1339-40.) (Emphasis added to underscore the statement the appellant argues is objectionable.)
"`"`Certainly the State's attorney should be permitted to comment on the character of the evidence presented by the State and its strength....'"' Taylor v. State, 279 Ala. 390, 391, 185 So.2d 414, 415, (1966), quoting Welch v. State, 263 Ala. 57, 81 So.2d 901 (1955)....
"In Hunt v. State, 659 So.2d 933 (Ala. Cr.App.1994), aff'd, 659 So.2d 960 (Ala. 1995), cert. denied, 516 U.S. 880, 116 S.Ct. 215, 133 L.Ed.2d 146 (1995), Hunt objected to a number of arguments made to the jury by the prosecutor, including one wherein the prosecutor stated that the State did not intend to ask the jury to convict the appellant on `flimsy evidence,' because the evidence presented was `overwhelming,' and that `at the conclusion of this trial that you will agree with the State of Alabama that the defendant is guilty of capital murder.' Id. at 940-41. Hunt also complained that the prosecutor argued to the jury that the evidence as to the defendant's guilt was overwhelming and that Hunt's guilt had been proven beyond a reasonable doubt, and stated that `if this isn't capital murder, then there has never been capital murder in Walker County.' This Court found no error in the prosecutor's arguments to the jury, stating:
"`"`[T]he rule on which the weight of authority is in agreement is that it is improper for the prosecuting attorney ... to express his personal opinion or belief in guilt of accused [so] as to permit an inference by the jury that such opinion or belief is based on reasons or information outside the evidence, but that it is not improper for him to argue or to express his opinion that accused is guilty, where he states, or it is apparent, that such opinion, is based solely on the evidence.' 23A C.J.S. Criminal Law § 1104, p. 194-95 *207 (1961). See Crenshaw v. State, 153 Ala. 5, 7, 45 So. 631, 632 (1908) (prosecutor argued to the effect that the evidence showed a clear case); Cranmore v. State, 41 Ala. App. 276, 279, 129 So.2d 121, 123 (1961) (prosecutor's statement, `I never did ask you to convict a man I believe to be innocent' found to be `a mere expression of opinion by the solicitor that the defendant was guilty, and ... not a cause for reversal'); Handley v. State, 214 Ala. 172, 175, 106 So. 692, 695 (1925) (argument, `She is a murderer; she is a murderer. She is not someone who has committed some of the lower offenses of homicide' did `not transcend the bounds of legitimate argument'); Gardner v. State, 17 Ala.App. 589, 590-91, 87 So. 885, 886, cert. denied, 205 Ala. 60, 87 So. 888 (1920) (prosecutor's argument that the defendant `is a pickpocket' in prosecution for grand larceny `was the expression of an opinion' by the prosecutor, `and from the state's contention was supported by one phase of the evidence.' Presiding Judge Bricken dissented, arguing that `it did not lie in the mouth of the solicitor to decide these vital questions'); McColston v. State, 20 Ala.App. 591, 593, 104 So. 347, 348-49 (1925) (prosecutor's argument, `He is guilty of the crime of highway robbery,' should be refrained from but did not constitute error); Dunn v. State, 19 Ala.App. 576, 577, 99 So. 154, 155 (1924) (prosecutor's comment, `I tell you that this defendant is guilty,' was merely an argument of the inference drawn by the solicitor and was not improper); Griggs v. State, 21 Ala.App. 530, 531, 109 So. 611 (1926) (prosecutor stated that from the evidence he believed the defendant was guilty, and that, if he did not believe the defendant was guilty, he would not ask the jury to convict him. Held: The opinion was based upon the evidence. `Where this is the case, such expression of opinion will not be sufficient upon which to predicate a reversal.'); Tucker v. State, 28 Ala.App. 492, 494, 188 So. 276, 277 (1939) (prosecutor's statement, `I believe he [defendant] is guilty' was a `mere expression of opinion by the solicitor' and not improper remark); Gilbert v. State, 19 Ala. App. 104, 106-07, 95 So. 502, 504 (1923) (prosecutor's closing argument, `He is guilty as hell itself under this testimony, and you know it' though not approved was `but the mere expression of counsel made in argument').
"`Galloway v. State, 484 So.2d 1199, 1201 (Ala.Cr.App.1986).'
"Hunt v. State, supra, at 941-42."
Price v. State, 725 So.2d 1003, 1028-29 (Ala.Cr.App.1997).
As the above excerpt from the record reflects, when the appellant objected, the prosecutor clarified that his confidence in the appellant's guilt was based on the evidence. Accordingly, when the allegedly objectionable comment is viewed in the context in which it occurred, it is apparent that the prosecutor was merely commenting on the strength of the evidence, and that he was not improperly encouraging the jury to convict "based on reasons or information outside the evidence." Price, 725 So.2d at 1028.
Furthermore, even if the comment were construed to be an impermissible expression of the prosecutor's personal opinion regarding the appellant's guilt, the comment in this case would not warrant reversal. "`[S]tatements of counsel in argument to the jury must be viewed as having been made in the heat of the debate, and such statements are usually valued by the jury at their true worth.'" Stephens v. State, 580 So.2d 11, 22 (Ala.Cr. App.1990), aff'd, 580 So.2d 26 (Ala.), cert. denied, 502 U.S. 859, 112 S.Ct. 176, 116 *208 L.Ed.2d 138 (1991), quoting Harris v. State, 539 So.2d 1117, 1123 (Ala.Cr.App. 1988).

C.
The appellant maintains that the prosecutor improperly argued facts not in evidence during the guilt phase of his closing argument. (Appellant's brief, Issue XVI, part D.) During the closing argument, as the prosecutor was discussing the "trail" of evidence at the riverside that implicated the appellant, the following occurred:
"This Defendant admitted that he was down there, and there is another piece of strong, cogent, convincing evidence, and I tell you that is the shoes that were worn ... and that the shoes that were found, they said they are the same size.
"What are the odds of the one print that they found down there and cast, that they were the Defendant's size?
"BY MR. GUSTIN: I object about arguing facts not in evidence and there has been no testimony that those shoes are the Defendant's size.
"BY THE COURT: Sustained.
"[Prosecution]: These shoes were obtained from the Defendant, Rayford Hagood.
"BY MR. GUSTIN: Your Honor, I object. He is arguing facts not in evidence. Those shoes were not obtained from Rayford Hagood.
"BY THE COURT: Sustained.
"[Prosecution]: They were obtained from his residence by the investigator in this case and this evidence was subject to cross-examination by the Defense as well as direct examination by the State and the evidence is that they are of the same size, the same width, the same round pattern on the bottom and even the little lines on the side are the same. A stick or something marred the area here and he could not make an absolute, one hundred percent identification...."
(R. 1334-35.)
The appellant claims that the prosecution's argument that the shoes belonged to the appellant was improper because, he maintains, it was not based on facts in evidence. We are not convinced that the prosecutor's argument was improper. There was evidence that the shoes the prosecutor was referring to were found in the mobile home where the appellant had been living, and that those shoes bore similar characteristics to the cast of the shoe-print found on the riverbank. The appellant admitted that he had been at the river on the night the victim was killed. Thus, the prosecutor's comment that the shoes belonged to the appellant was a logical inference from the evidence presented. Burton v. State, 651 So.2d 641, 651-52 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995). Furthermore, the trial court sustained the appellant's objection to the allegedly improper portion of the argument, and the appellant did not seek any further relief. Accordingly, we find no reversible error.

XVII.
The appellant contends that the trial court erred to reversal in allowing the state to introduce into evidence the audio-taped telephone conversation between the appellant and the victim's wife.
As discussed above, Investigator Frank Cole interviewed the victim's wife, Mildred Price, at his office on the day the victim's body was found. Cole took several statements from Mildred. As a result of those statements, Cole requested that Mildred telephone the appellant from his office, and she agreed to do so. Unknown to the appellant, the telephone conversation was recorded. In the telephone conversation, Mildred and the appellant agreed to adhere to their concocted story that on the *209 night of the victim's death, she saw the victim leave their home with two men.
The prosecution sought to introduce into evidence the audio-tape of the conversation between the appellant and Mildred Price on the basis that it constituted an exception to the prohibition against hearsay because, it argued, it was a statement of a coconspirator made in the course of and in furtherance of the conspiracy.[9] In addition, the prosecution argued that the recording was admissible because it was an admission against interest by the appellant.
Defense counsel objected to the admission into evidence of the recording. He maintained that any conspiracy between the appellant and Mildred Price had ceased at the time the recording was made. In the alternative, the appellant argued that even if the recording were an admission against interest by the appellant, it was nonetheless inadmissible because Mildred Price was acting as an agent of the police when she was engaged the appellant in the conversation, and, therefore, he should have been apprised of his Miranda[10] rights before the conversation took place.
The prosecution countered that no Miranda warnings were required because the appellant was not in custody at the time of the telephone conversation. The trial court overruled the appellant's objection to the admission of the recorded conversation.
The appellant contends that the trial court's ruling was erroneous. In support of his assertion, he reasserts the argument he raised at trialthat any conspiracy between the appellant and Mildred Price had ceased when the telephone call was made, and that, therefore, the conversation was not properly admitted as a statement by a coconspirator in the course of and in furtherance of a conspiracy.
We need not determine whether the recorded conversation was a statement of a coconspirator made in the course of and in furtherance of the conspiracy; the recorded conversation was admissible because it constituted an admission by the appellant.
"`[A]ny and every statement by an accused person, so far as not excluded by the doctrine of confessions ... or by the privilege against self-incrimination ... is usable against him as an admission....' 6 Wigmore, Evidence 1732 at 156 (Chadbourn rev.1976) (emphasis in original). `The rule is that the acts, declarations, and demeanor of an accused, before or after an offense, whether a part of the res gestae or not, are admissible against him, but, unless a part of the res gestae, are not admissible for him.' Shadle v. State, 280 Ala. 379, 384, 194 So.2d 538, 542 (1967). `The general rule in this state relative to an accused is that "the acts, declarations and conduct of the accused, against interest, are always competent." ... "[A]mong the reasons why this is so insofar as declarations are concerned is that "all that the accused voluntarily wrote or said which is material to the charge, is competent against him because it is his own admission and against his own interest."` Blackwell v. State, 264 Ala. 553, 557, 88 So.2d 347, 350 (1956). See Dennis v. Scarborough, 360 So.2d 278, 280 (Ala.1978); Malone v. Hanna, 275 Ala. 534, 536, 156 So.2d 626, 628 (1963); Whiddon v. Malone, 220 Ala. 220, 223, 124 So. 516, 518 (1929); C. Gamble, McElroy's Alabama Evidence § 180.01 (3d ed.1977)."
*210 McLaney v. City of Montgomery, 570 So.2d 881, 882 (Ala.Cr.App.1990.)
"[A]s this court recently stated in Whitley v. State, 628 So.2d 1030 (Ala.Cr.App. 1993):
"`"Any conduct or declaration of the accused having relation to the offense charged and indicating a consciousness of guilt, is admissible against him at trial. Nicks v. State, 521 So.2d 1018, 1028, (Ala.Cr.App.1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988)."'
"Whitley, 628 So.2d at 1032 quoting, Henderson v. State, 583 So.2d 276 (Ala. Cr.App.1990), aff'd, 583 So.2d 305 (Ala. 1991), cert. denied, [503] U.S. [908], 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). See also Sparks v. State, 376 So.2d 834, 843 (Ala.Cr.App.1979).
"As Judge Bowen further stated in Greathouse v. State, 624 So.2d 202, 206 (Ala.Cr.App.1992), quoting Willingham v. State, 261 Ala. 454, 458, 74 So.2d 241, 244 (1954): `"`The acts, declarations, and demeanor of an accused, before or after the offense, whether a part of the res gestae or not, are admissible against him....'"'"
Madden v. State, 628 So.2d 1050, 1052 (Ala.Cr.App.1993).
"Extrajudicial statements of a party `are admissible as admissions of the party, and in such event no predicate is necessary.' Dickson v. Dinsmore, 219 Ala. 353, 355, 122 So. 437 (1929). We find these same principles applicable in a criminal prosecution with the additional requirement that the State is required to prove the voluntariness of any admission or declaration made by the accused. Guenther v. State, 282 Ala. 620, 623, 213 So.2d 679 (1968), cert. denied, 393 U.S. 1107, 89 S.Ct. 916, 21 L.Ed.2d 803 (1969)."
Welborn v. State, 580 So.2d 1, 2 (Ala.Cr. App.1989). See also Ala. R. Evid. 801(d)(2); C. Gamble, McElroy's Alabama Evidence, § 180.01(1) (5th ed.1996).
While Mildred Price did telephone the appellant from the investigator's office at the suggestion of the investigator, there is absolutely no indication that the appellant was aware of this, or that he confessed falsely because of this.
"Alabama follows the general rule that a confession is not inadmissible merely because it was induced by a trick or misrepresentation that was not reasonably calculated to lead the accused to confess falsely. Fincher v. State, 211 Ala. 388, 100 So. 657 (1924); Bates v. State, 549 So.2d 601 (Ala.Cr.App.1989); Barrow v. State, 494 So.2d 834 (Ala.Cr.App.1986); 2 C. Gamble, McElroy's Alabama Evidence 200.07(7) (5th ed.1996)."
Campbell v. State, 718 So.2d 123, 136 (Ala. Cr.App.1997) (tape-recorded telephone conversations between the victim and the defendant, in which the defendant made incriminating statements, made pursuant to a police request and while the victim was at the police headquarters were not inadmissible; "[a]ny alleged misrepresentation, under the circumstances here, could not reasonably have led the appellant to confess falsely" 718 So.2d at 135). See also Bates v. State, 549 So.2d 601 (Ala.Cr. App.1989). Here, the evidence supports the conclusion that the appellant's statements during the telephone conversation were voluntary.
Furthermore, the fact that the appellant was not apprised of his Miranda rights does not render the tape-recorded conversation inadmissible.
"Miranda warnings are required only when a suspect is in custody and is subjected to interrogation by a law enforcement officer. Miranda [v. Arizona], 384 U.S. [436] at 477-78, 86 S.Ct. 1602, 16 L.Ed.2d 694; Cure v. State, 600 So.2d 415 (Ala.Cr.App.), cert. denied, 600 So.2d 421 (Ala.1992); Perkins v. State, 574 So.2d 988 (Ala.Cr.App.1990); Molina v. State, 533 So.2d 701 (Ala.Cr. App.1988). The coercion against which Miranda was designed to protect can *211 occur only through the interaction of these two elements. Illinois v. Perkins, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990)."
Campbell, 718 So.2d at 135. See also, Clay v. State, 687 So.2d 1245 (Ala.Cr.App.1996); Bates, supra. The appellant was clearly not in custody when he engaged in the telephone conversation with Price.
Accordingly, the trial court did not err in admitting the tape recording of the conversation into evidence.

XVIII.
Pursuant to the appellant's request, we have reviewed the state's evidence, and we conclude that the state presented sufficient evidence to support a finding that the appellant intentionally murdered the victim during a kidnapping in the first degree. See §§ 13A-5-40(a)(1), 13A-6-2(a)(1), and 13A-6-43(a)(3), Code of Alabama 1975. The evidence, when viewed in the light most favorable to the state, White v. State, 546 So.2d 1014, 1016-18 (Ala.Cr.App.1989), established that the appellant attacked and viciously beat the victim in the victim's home. After severely injuring the victim, the appellant tightly bound the victim with duct tape. He then drove to a river, where he dumped the partially clad victim in the river, in extremely cold weather. The victim drowned. There was testimony that had the victim not drowned, he would most likely have died from the injuries inflicted during the beating. Accordingly, the trial court properly submitted the case to the jury, and the jury's verdict is amply supported by the evidence.

XIX.
The appellant claims that the trial court unreasonably restricted his cross-examination of Cindy Stewart and Johnny Stewart, Mildred Price's daughter and son-in-law. In support of his contention, he refers this Court to several places during his cross-examination of these witnesses where, he claims, the trial court improperly limited his examination. During the line of questioning where the supposedly erroneous rulings occurred, the appellant was attempting to ask the witness about the victim's alleged violent behavior toward the witness or to the victim's family.
"`[A] criminal defendant has the right to a thorough and sifting cross-examination, but that right is not absolute. The latitude and extent of cross-examination are matters within the sound discretion of the trial court, and in the absence of abuse, that discretion is not reversible on appeal.'
"Ex parte Pope, 562 So.2d 131, 134 (Ala. 1989), cert. denied, 498 U.S. 841, 111 S.Ct. 118, 112 L.Ed.2d 87 (1990). `The trial court has the discretion reasonably to limit the range of cross-examination in respect to collateral and irrelevant matters or with respect to matters that unnecessarily consume time in the trial of the case.' C. Gamble, McElroy's Alabama Evidence § 136.01 (4th ed.1991). Furthermore, `[o]n appeal, the party claiming that a trial judge has abused his discretion in such aspect bears the burden of persuasion.' Connell v. State, 294 Ala. 477, 481, 318 So.2d 710, 714 (1974)."
Smiley v. State, 655 So.2d 1074, 1091 (Ala. Cr.App.1993), reversed on other grounds, 655 So.2d 1091 (Ala.1995) (emphasis added). See also Wright v. State, 641 So.2d 1274, 1278 (Ala.Cr.App.1993); Cosby v. State, 627 So.2d 1059, 1061 (Ala.Cr.App. 1993) ("[t]he extent of cross-examination is within the trial judge's discretion and his decision will not be disturbed without a showing of an abuse of that discretion"); Beavers v. State, 565 So.2d 688, 689 (Ala. Cr.App.1990) ("[i]t is a well-established rule in this state that the latitude and extent of cross-examination are matters which of necessity rest largely within the sound discretion of the trial court, and rulings with respect thereto will not be revised on appeal except in extreme cases of abuse").
*212 A question arises as to whether the appellant obtained an adverse ruling in each of the allegedly improper instances. In one of the instances cited by the appellant, although the trial court did sustain the state's objection to a question propounded by the defense counsel, it did so only after the witness had already answered the question. (R. 545.) The state did not move for the answer to be stricken, and the trial court did not prohibit the appellant from continuing his cross-examination. In another instance cited by the appellant, the trial court did not rule on the state's objection to the appellant's question; rather, after noting that the line of questioning was repetitive, the trial court permitted the appellant to continue with his cross-examination. (R. 575.)
In any event, we have examined each instance cited by the appellant and we cannot say that the trial court abused its discretion in limiting the cross-examination. The questions were either repetitive or they sought improper hearsay or irrelevant evidence. Accordingly, no reversible error occurred.

XX.
The appellant claims that the trial court erred in denying his motion to suppress his confession. The basis of his contention is twofold. First, he argues that his confession was involuntarily induced. In support of this assertion, he alleges that en route to the police station, Investigator Cole talked with him about his (the appellant's) belief that the victim was abusing the child who the appellant believed was his son. He contends that Cole promised him "that he would help him out and see that something was done for him because he understood how he felt." (Appellant's brief, p. 78.) He suggests that the investigating officer "played on [his] sympathy and feelings in order to obtain the statement." (Appellant's brief, p. 78.) Second, the appellant maintains that the trial court erred in admitting the confession into evidence without first redacting a statement made by one of the investigating officers during the interrogation. Specifically, the appellant contends that the trial court should have redacted the portion of the statement wherein Investigator Tirey asked the appellant, "You don't think you hated him [the victim] bad enough for you to just shove him on out there and say, `Good-bye, Sucker'?" (R. 801.) He intimates that the use of the phrase "Good-bye, Sucker" was offensive and inflammatory, and should have been redacted.
"`In determining whether a confession is voluntary, the trial court's finding of voluntariness need only be supported by a preponderance of the evidence. Seawright v. State, 479 So.2d 1362, 1367 (Ala.Cr.App.1985). The trial court's decision will not be disturbed on appeal unless it is manifestly contrary to the great weight of the evidence. "`"The test for the voluntary nature of an extrajudicial confession or inculpatory statement is whether in light of all the surrounding circumstances, the statement was free from inducement, threat or promise, either expressed or implied, which would have produced in the mind of the accused any fear of harm or hope of favor."'" Seawright, 479 So.2d at 1367, citing Rogers v. State, 365 So.2d 322 (Ala.Cr.App.), cert. denied, 365 So.2d 334 (Ala.1978).'
"Dixon v. State, 588 So.2d 903, 907 (Ala. 1991), cert. denied 502 U.S. 1044, 112 S.Ct. 904, 116 L.Ed.2d 805 (1992).
"Whether a waiver of Miranda rights is knowingly and intelligently made depends on the facts of each case, considering the totality of the circumstances surrounding the interrogation, including the characteristics of the accused, the conditions of the interrogation, and the conduct of the law enforcement officials. Staten v. State, 547 So.2d 603 (Ala.Cr. App.1988), rev'd on other grounds, 547 So.2d 607 (Ala.1989); Moore v. State, 415 So.2d 1210 (Ala.Cr.App.1982), cert. denied, 459 U.S. 1041, 103 S.Ct. 459, 74 L.Ed.2d 610 (1982). The question *213 whether a confession is knowing and voluntary is a question of law for the trial court, and the trial court's finding on that issue will not be reversed on appeal unless it is contrary to the great weight of the evidence or is manifestly wrong. Staten; Hubbard v. State, 500 So.2d 1204 (Ala.Cr.App.), aff'd, 500 So.2d 1231 (Ala.1986), cert. denied, 480 U.S. 940, 107 S.Ct. 1591, 94 L.Ed.2d 780 (1987)."
Harris v. State, 705 So.2d 542, 546 (Ala.Cr. App.1997).
The state presented evidence, both at trial and at the suppression hearing, that the appellant voluntarily accompanied the investigators to police headquarters. He was apprised of his rights en route to the station, and again at the station. The state's evidence established that the appellant understood his rights and that he knowingly and willingly waived his rights. Neither investigator threatened the appellant or offered him any hope of reward in return for his statement. Furthermore, there was no evidence that the appellant was under the influence of any sort of drugs. Both Investigator Cole and Tirey denied that en route to the station they discussed with the appellant the appellant's belief that the victim was abusing his son; that subject was discussed later, during the appellant's confession. Investigator Cole specifically denied that he suggested to the appellant that if he cooperated, he would help the appellant with his son.
The appellant testified at the suppression hearing, in pertinent part, that on the way to the police station, Investigator Cole told him that he knew "there was an 18-month-old child involved in the crime." (R. 740.) The appellant testified that Cole told him, "`I have children of my own, a small one in fact,' and he said `If you will cooperate with me I will try to help you.'" (R. 740-41.) He testified that Cole then asked him if he knew anything about the victim's death, and he indicated that he did. The appellant said that he answered Cole's questions because he thought that he would help him. The appellant claimed that he was not apprised of his rights en route to police headquarters.
Although the appellant's rendition of the facts regarding what was discussed on the way to the police headquarters conflicted with the investigators,' the trial court found that the appellant's confession was voluntary, and this finding is entitled to great weight. Thomas v. State, 625 So.2d 1174 (Ala.Cr.App.1993). Based on the totality of the circumstances, we hold that the trial court's decision to admit the confession is supported by a preponderance of the evidence.
Any error in the trial court's failure to redact the allegedly objectionable question was harmless. When Investigator Tirey asked the appellant, "You don't think you hated him bad enough for you to just shove him on out there and say, `Good-bye Sucker'?" the appellant answered, "No, sir." (R. 801.) "A negative answer to an improper question does not constitute reversible error." Hardeman v. State, 651 So.2d 59, 62 (Ala.Cr.App.1994). Although this principle is generally applied to questions asked of witnesses during trial, we see no reason why it would not apply to the situation presented here.
Accordingly, the judgment of the trial court in denying the appellant's motion to suppress is affirmed.
The appellant's conviction is affirmed; however, for the reasons set forth above, his sentence is reversed and this cause is remanded to the trial court for new sentencing proceedings.
AFFIRMED AS TO CONVICTION; REVERSED AS TO SENTENCE; AND REMANDED FOR NEW SENTENCING PROCEEDINGS.
LONG, P.J., and McMILLAN and BASCHAB, JJ., concur.
COBB, J., recuses.
NOTES
[1] The record is somewhat confusing as to whether the appellant actually challenged this prospective juror for cause. After the prospective juror responded that he would probably give the state's witness more credence, defense counsel questioned L.R. regarding where he was employed. The following then occurred:

"Q [Defense counsel]: I have no problem.
"BY THE COURT: Let's see how it works out.
"[Defense counsel]: Can we withhold the motion on that one?
"BY THE COURT: Yes, I'm withholding it. Denying, excuse me."
(R. 41.) Although it is not clear, the trial court apparently interpreted defense counsel's remarks to be a challenge for cause; therefore, we will assume, for the sake of argument, that the appellant preserved his argument for appellate review.
[2] One theory presented by the defense was that the appellant intended to kidnap Price but that he did not intend to kill him.
[3] The prosecution moved to strike prospective juror T.P. for cause, and that motion was denied by the trial court; there is no indication that the prosecution challenged for cause prospective juror V.M.
[4] While the record does reflect that prospective juror C.E. did not serve on the jury, the record does not indicate which party struck C.E. We note, however, that the trial court had previously denied the prosecution's challenge for cause of C.E.
[5] The general rule that an expert's opinion in response to a hypothetical question should be based on facts in evidence was not altered by the implementation of Rule 703, Ala.R.Evid., which provides that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing." See the committee comments to Rule 703, ("Rule 703 leaves unaffected the preexisting Alabama law requiring that the facts or data relied upon by the expert, and gotten by the expert other than by firsthand knowledge, generally must be admitted into evidence.") See also, C. Gamble, McElroy's Alabama Evidence, § 127.02(5) (5th ed.1996).
[6] The appellant also makes the bare allegation that this practice, which is commonly referred to as "double counting" or "overlapping," violates several other Constitutional provisions, as well as Alabama law; however, he has presented no argument in support of this allegation. Accordingly, we will address only the appellant's assertion that his Fifth Amendment rights were violated.
[7] Section 13A-5-49(4), Code of Alabama 1975, provides: "Aggravating circumstances shall be the following: ... [t]he capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit... kidnapping."
[8] The proposed pattern jury instructions on the capital offense of murder committed during a robbery read, in relevant part:

"The defendant commits the crime of robbery in the first degree if he uses or threatens the use of force against the owner of personal property or any person present, while in the course of committing a theft of personal property with the intent to overcome his physical power of resistance in order to compel his acquiescence in the taking of the personal property, and in the course of said theft (or attempt thereof) either:
"(1) Intentionally causes serious physical injury or death to a person; OR
"(2) Is armed with a deadly weapon or dangerous instrument.
".... A person commits the crime of theft of property if he knowingly obtains or exerts unauthorized control over the property of another, with intent to deprive the owner of his property...."
(Emphasis in original.)
[9] Rule 801(d)(2), Ala.R.Evid., provides, in relevant part, that a statement that is "offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is now definitionally nonhearsay. Prior to the implementation of the new rules of evidence, it had been considered an exception to the prohibition against hearsay.
[10] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).